(No. 54680.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JUAN CABALLERO, Appellant.

*Opinion filed March 23, 1984.—Rehearing denied June 4, 1984.*

24

SIMON, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, of Chicago, and Michael E. Shabat, Joan S. Cherry, and Michael J. Kelly, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE RYAN delivered the opinion of the court:

Defendants, Juan Caballero and Luis Ruiz, were charged by information filed in the circuit court of Cook County with the murders of three teenage males, Michael Salcido, Arthur Salcido, and Frank Mussa. Additionally, charges of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2) and unlawful restraint (Ill. Rev. Stat. 1979, ch. 38, par. 10—3(a)) regarding each victim were filed against the defendants. Pursuant to a severance, the two defendants were tried before one judge supervising two separate juries. Both defendants were convicted on all counts. Separate sentencing hearings were held for each of the defendants at which the imposition of the death penalty was requested. Both defendants were sentenced to death. Both sentences were stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court under Rule 603 (87 Ill. 2d R. 603). We have previously considered and affirmed the conviction and sentence of death for Luis Ruiz. (*People v. Ruiz* (1982), 94 Ill. 2d 245.) In this opinion, we consider only the convictions and death sentence of Juan Caballero. We affirm both the murder convictions and the sentence of death.

One of the victims, Michael Salcido, was a Chicago resident. Following a visit to Princeton, Illinois, to see his brother Arthur, the two brothers and a friend, Frank Mussa, drove from Princeton to Chicago on February 24, 1979, in order to return Michael to his home. The three youths arrived in Chicago around midnight, visited with Michael's mother at her apartment, and then proceeded to a neighborhood restaurant at about 1 a.m.

At the restaurant, the three encountered the defendant and Luis Ruiz, Placedo LaBoy, and Nelson Aviles. Although they were strangers to each other, Michael approached Ruiz and asked if he knew where he could buy some marijuana. Ruiz professed ignorance as to a possible source. Michael sought to establish a relationship with the strangers by asserting that he knew a Jose Cortez, a member of a gang known as the Latin Eagles. Ruiz responded by asking Michael if he was an Eagle. Michael answered yes and went on to boast that he had assisted Cortez in killing members of a rival gang, the Latin Kings. Unbeknownst to Michael, Ruiz was actually a member of the Latin Kings and not the Latin Eagles. Ruiz, however, did not reveal this to Michael, Arthur, and Frank. Instead, Ruiz said that he, Caballero, Aviles, and LaBoy were Eagles like Michael. Ruiz then said that he could take them to buy marijuana.

According to a confession signed by Caballero, all seven youths then entered the car which Michael and his friends were using. Michael, Arthur, and Frank occupied the front seat while Caballero, Ruiz, LaBoy, and Aviles occupied the back seat. Pursuant to Ruiz' instructions, the car was driven into an alley and parked. The occupants of the back seat then alighted and instructed Michael, alone, to bring money and follow them around a corner. After the corner was turned, Ruiz explained the deception to Michael and expressed his anger at Michael for helping to kill his friends. This was followed by the

four Kings beating Michael until they were "satisfied." Ruiz and LaBoy then returned to the car, took control of the wheel, and drove around the corner to pick up Michael, Aviles, and Caballero. After everyone was in the car, the four Kings began to talk in Spanish so the other boys would not understand. The subject of the conversation was that Michael and his friends should be killed because they had seen their faces and could identify them. They then drove into a second alley.

After parking in the alley, Caballero and LaBoy took Michael and Frank out of the car, down the alley, and into a gangway where LaBoy stood guard over them with a gun. Caballero then returned to the car where he saw Aviles stabbing Arthur and heard him gasping for breath and the gurgling of blood as it came out of his throat. LaBoy then brought Frank from the gangway to the car. At this point, Caballero was offered the opportunity to stab Frank; however, he stated that he would prefer to shoot him. Ultimately, Caballero encouraged LaBoy to cut Frank's throat, which was accomplished, and Caballero went to retrieve Michael. Caballero returned with Michael, who was told to lie in the back seat of the car. As Michael began to enter the car, he evidently observed the bodies of his friends in the front seat as Caballero related that he had to push Michael headfirst into the car. Caballero then pulled Michael's head back, slit his throat, and then stabbed Michael in the chest several times. Following the murders, the four men rummaged through Michael's suitcase. Socks from the suitcase were used in an unsuccessful attempt to wipe the car clean of fingerprints so, as defendant stated, "we wouldn't get caught." They then left the scene. Caballero and Ruiz were arrested and charged on March 3, 1979, after the police matched Ruiz' fingerprints to a fingerprint found on the car.

Further evidence against the defendant included the

testimony of Julio Lopez, also a Latin King, which was that .he saw the four Kings together on the night of the murder in the vicinity of the crime. Dr. Robert Kirschner, a pathologist, also testified regarding the stab wounds on the victims. His description of the wounds found on Michael's body corroborated Caballero's version of how Michael had been killed. Following the defense presentation, Raymond Wesolowski testified in rebuttal for the State that he was arrested and placed in the cell next to Caballero's. Wesolowski testified that they shared a cigarette. He asked defendant what he was "in for." Caballero related that he had been charged with murder. Caballero asked Wesolowski if he had read about the three Latin Eagles that had been killed. When Caballero was asked if he had killed them, he said that he had.

We will first comment on a deficiency in this record which has been occurring in other criminal appeals with increasing frequency. No post-trial motion has been filed in this case specifying the grounds upon which defendant relies for reversal. The Code of Criminal Procedure of 1963 requires that a written motion for a new trial specifying the grounds therefor shall be filed by the defendant within 30 days following the return of the verdict. (Ill. Rev. Stat. 1979, ch. 38, par. 116—1.) The general rule followed by this court is that the failure to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a grounds for reversal on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282.) Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended.

Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance. In this case, for instance, 18 issues have been raised on appeal, some of which were obviously considered insignificant by trial counsel.

Counsel has an obligation to this court to comply with the statute, and trial counsel for the prosecution has an obligation to object to general oral statements made by defense counsel that may be viewed as an oral motion for a new trial. If prescribed procedures are followed, needless time spent in briefing, arguing and considering countless superficial errors can be saved. In this case there was a general discussion, not about a motion for a new trial, but by way of an objection to a proposed judgment and execution order, in which a general attack on the constitutionality of the death penalty statute was made, and a statement was made to the effect that the jury was improperly impaneled for the purpose of seeking the death penalty. For those reasons, "and many more reasons on which I do not care to elaborate at this point in time," defense counsel objected to the judgment and execution order. The prosecution made no objection to this oral statement. Nor is it clear whether it was intended that this be considered as an oral motion for a new trial. The defense counsel thereafter requested that the defendant be allowed to file a motion for a new trial, and the court stated that defense counsel could file the motion. None was filed.

Since this is a death penalty case, which under our constitution is automatically reviewed by this court (Ill. Const. 1970, art. VI, sec. 4(b)), we must review the case whether or not a written motion for a new trial has been filed. Otherwise, the constitutional provision for an automatic appeal would be meaningless. We wish to restate, however, that, regardless of this court's duty to review

death penalty cases, trial counsel has an obligation to see that the statute is complied with so that the review will be limited to issues of some significance.

The defendant first contends that the trial court erred in refusing to suppress oral and written confessions which he made following his arrest. The defendant's argument is that the confessions were involuntary and therefore inadmissible. It is, of course, true that it is the State's burden to establish by the preponderance of the evidence that the confessions were voluntary. (Ill. Rev. Stat. 1979, ch. 38, par. 114—11(d); *Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 627; *People v. Harper* (1967), 36 Ill. 2d 398, 402.) It is also true that the trial court's findings will not be reversed unless they are against the manifest weight of the evidence. *People v. Holloway* (1981), 86 Ill. 2d 78, 91.

A preliminary issue raised by the defendant concerns the breadth of the evidence which a court of review may consider in determining if the trial court committed reversible error in denying the motion to suppress. It is defendant's position that his testimony that Officer Epplen and Officer Flood had beaten him prior to his confession has not been rebutted. He argues that the State therefore has not proved that his confession was voluntarily made. At the suppression hearing prior to trial, Epplen denied that he had beaten defendant. Although Flood testified at the suppression hearing, the defendant argues that Flood was not asked whether he had beaten the defendant. The court ruled that the confession was admissible. At the trial it was introduced into evidence. The defendant then testified in his own behalf charging that the two officers had beaten him prior to the confession. On rebuttal, Flood testified that he never struck the defendant. Thus the record contains a denial of defendant's charges by both Epplen and Flood; however

Flood's denial was made at the trial after the confession had been admitted into evidence.

The defendant, citing *People v. Braden* (1966), 34 Ill. 2d 516, argues that a court of review is limited to considering evidence presented at the suppression hearing and to evidence introduced at trial *prior* to the admission of the allegedly illegally obtained confession. The State's position is that an appellate court may consider *all* evidence presented at trial in addition to the evidence from the suppression hearing.

In *Braden,* the testimony at trial had been given before the introduction of the questioned evidence. This court framed the issue in that case as "whether the additional testimony at the trial prior to the introduction of the evidence obtained by the search cures the error of the trial court in denying the preliminary motion to suppress." (34 Ill. 2d 516, 520.) The court concluded that such evidence could be considered. In support of this conclusion, the court quoted from the opinion in *Commonwealth v. Young* (1965), 349 Mass. 175, 206 N.E.2d 694, which upheld appellate consideration of evidence introduced at trial. The *Young* court was quoted for its comment that "any error [in denying the motion to suppress] was not prejudicial, for probable cause appeared before the confession was admitted in evidence." (349 Mass. 175, 178, 206 N.E.2d 694, 696.) Following that quotation, this court said that "[w]e conclude that since the evidence at the trial established the legality of the arrest and the search in this case, defendant cannot avail himself of any error on the motion to suppress." *People v. Braden* (1966), 34 Ill. 2d 516, 520.

The *Braden* court's holding does not explicitly refer to only evidence introduced at trial prior to admission of the allegedly illegal evidence. Nonetheless, some appellate court opinions, evidently in reliance upon the framing of the issue and the previously mentioned language

quoted from *Young,* reflect a belief that the defendant is correct in arguing that *Braden* limits a reviewing court to considering only trial evidence which was introduced prior to the admission of the allegedly illegally obtained evidence. See, *e.g., People v. Griswold* (1977), 54 Ill. App. 3d 246, 250; *People v. Meacham* (1977), 53 Ill. App. 3d 762, 766; *People v. Glanton* (1975), 33 Ill. App. 3d 124, 137-38. But see *People v. Sledge* (1981), 92 Ill. App. 3d 1051, 1056-57.

This court has cited *Braden* for the proposition that "it is also permissible for the reviewing court to consider those findings of fact which are drawn from the testimony elicited at trial." *(People v. Conner* (1979), 78 Ill. 2d 525, 532.) In *Conner* this court did not limit the evidence that may be considered to that produced before the questioned material was introduced.

We note that *Braden* involved a motion to suppress illegally seized evidence. Under the statute (Ill. Rev. Stat. 1979, ch. 38, par. 114—12(b)), the burden is on the defendant to prove that the search was unlawful. We noted above that the statute places the burden on the State to prove that a confession is voluntary. *Braden* does not discuss the burden-of-proof question, but appears to consider the burden as being on the State, which it would be if the defendant has made a *prima facie* showing of an illegal search and seizure. *People v. Clark* (1977), 55 Ill. App. 3d 379, 385.

For the following reasons, we find that *Braden* did not announce the rule which some of the panels of the appellate court perceive and for which the defendant argues. As the *Braden* court pointed out, the defendant is required to make a pretrial motion to suppress simply to avoid extended collateral inquiries at trial. *(People v. Castree* (1924), 311 Ill. 392, 397.) Additionally, as this court noted in *Braden,* the pretrial ruling on suppression is not final and may be changed or reversed at any time

prior to final judgment. (*People v. Braden* (1977), 34 Ill. 2d 516, 520; see also *People v. Fox* (1925), 319 Ill. 606, 609.) Therefore, the rule is procedural rather than substantive. Accordingly, there does not seem to be any special sanctity to the evidence introduced prior to the admission of the allegedly illegal evidence which should preclude a court of review from reviewing the trial evidence introduced after that admission.

Although the court in *Braden* did not discuss *People v. La Bostrie* (1958), 14 Ill. 2d 617, that decision specifically holds that a court, on review, may consider trial evidence in determining whether the trial court's decision denying a motion to suppress was correct. The court stated:

> "We find it unnecessary to consider whether the evidence at the hearing on the motion, standing alone, was sufficient, for if the evidence at the trial was sufficient to sustain the introduction of the narcotics in evidence, it is immaterial that there might have been inadequacy of evidence at the hearing on the motion. [Citation.] We shall, therefore, consider all of the evidence, both at the hearing on the motion and at the trial, to determine whether the trial court properly admitted in evidence the narcotics which were found on defendant's person at the time of his arrest." (14 Ill. 2d 617, 620-21.)

For the reasons we have stated above, we reaffirm the holding of *La Bostrie.*

Even if the testimony at trial is not considered, we find that the testimony given at the pretrial hearing supports the denial of the motion to suppress. The defendant testified at the hearing that his confessions were given only after he was twice taken to the washroom where he was beaten by Epplen and Flood. The defendant asserts that his testimony was never rebutted by the State. At the suppression hearing, Epplen testified that he did take the defendant to the washroom. However, he denied going into

the washroom because it is not large enough to accommo-
date two people. Flood testified that he did not remember
ever taking the defendant to the washroom. The defend-
ant, citing *Haynes v. Washington* (1963), 373 U.S. 503, 10
L. Ed. 2d 513, 83 S. Ct. 1336, contends that the failure of
Flood to explicitly deny that he beat the defendant makes
it impossible for the State to have sustained its burden of
proof.

We find *Haynes* inapposite because in our case the
charges that the defendant was beaten by Epplen and
Flood were expressly denied at the suppression hearing.
Flood testified that he never saw any Chicago police officer
strike defendant; that he never saw any Chicago police of-
ficer abuse defendant in any way; that he never saw any-
one threaten defendant; and that he never saw anyone
strike defendant. Although these answers do not explicitly
say that Flood, himself, did not strike defendant, implicit
in this testimony is the denial that he did. Epplen, in his
testimony at the suppression hearing, likewise said he
never saw any police officer or anyone else beat defendant.
He denied that he had beaten defendant and he stated that
Flood did not strike defendant.

Defendant's testimony was that both Epplen and Flood
were present when the beatings were administered. His
testimony does not stand uncontradicted. Although Flood,
himself, did not explicitly deny striking the defendant, an
express denial of Flood's involvement is found in Epplen's
testimony.

As noted above, we need not base our decision on the
evidence given at the suppression hearing alone, but may
also consider evidence given at the trial. However, we
must conclude from the above that the testimony of the
defendant at the suppression hearing that he was beaten
by Epplen and Flood did not stand uncontradicted at the
close of the suppression hearing.

The defendant's first attack on the conduct of the trial

focuses upon statements made in closing argument by one of the prosecutors. The defendant claims that the statements improperly informed the jury that evidence not in the record corroborated the testimony of Raymond Wesolowski regarding Caballero's admission of guilt while in jail. The State counters that the statements were proper comment invited by defense counsel's closing argument. Each side's argument depends on a different interpretation as to whom defense counsel was referring in closing argument, Sergeant Hoffman or Wesolowski, when he used the ambiguous pronoun, "he." Both interpretations are plausible and we shall not attempt to resolve the matter. It is possible that the jury understood the reference in the same way that the prosecution did, that is, that the pronoun referred to Sergeant Hoffman. So understood, the argument of defense counsel was improper and did invite the reply now complained of. Furthermore, the jury was thoroughly admonished, by both court and counsel, to ignore closing arguments which did not accurately state the evidence. We also find that this question was not properly preserved for review. Although defense counsel objected to the statement, the judge did not rule on the objection and defense counsel did not request a ruling or call the judge's attention to the fact that no ruling had been made. The question is therefore not preserved for review. *People v. Rossi* (1972), 52 Ill. 2d 13, 17.

The defendant next raises several issues regarding the accountability instruction which was given to the jury. The jury was instructed that:

> "A person is responsible for the conduct of another person when either before or during the commission of *a crime* with the intent to promote or facilitate the commission of *a crime*, he knowingly solicits, aids, abets or agrees or attempts to aid the other person in planning or the commission of *a crime*." (Emphasis added.)

The italicized portions of the instruction differs from the

pattern jury instruction on accountability, as noted below.

> "A person is legally responsible for the conduct of another person when, either before or during the commission of *an offense*, and with the intent to promote or facilitate the commission of *that offense*, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of *the offense*." (Emphasis added.) (Illinois Pattern Jury Instruction (IPI), Criminal, No. 5.03 (2d ed. 1981).)

Defendant argues that the changed language in the given instruction created the possibility that the jury in this case may have convicted the defendant of the murder of Frank Mussa and Arthur Salcido by accountability merely because the defendant was committing the crime of unlawful restraint without intending to thereby facilitate the murders.

During deliberation, the jury sent a note to the judge which stated:

> "We interpret the law to mean this: if Juan is holding a gun on Frank and Michael, while nearby Popeye is murdering Arthur, even though Juan may not know the murder is being committed, Juan is equally as guilty as Popeye of the murder. Is this a correct interpretation?"

Upon receiving the question, the court called counsel into chambers to discuss what, if any, response should be given. Defendant's trial counsel argued that the jury had received proper instructions which should not be supplemented at all. He urged the court to simply inform the jury to continue its deliberations with the existing instructions. Over this objection, the trial court called the jury into the courtroom and said to them:

> "Your answer should be found in the instructions, which are very specific, and basically there are two instructions that if you read them, I cannot see how you can have any problems, and that is the accountability instruction which reads a person is responsible for the conduct of another person when either before, or during the commission of a crime, with the intent to promote, or fa-

cilitate the commission of a crime, he knowingly solicits, aids or abets or agrees or attempts to aid the other person in planning or the commission of a crime.

If you read that and read the murder instruction which basically reads that, that the defendant or one [for] whose conduct he is responsible performed the acts which caused the death of Michael Salcido and second, when the defendant or one for whose conduct he is responsible did so, he or one [for] whose conduct he is responsible intended to kill or do great bodily harm to Michael Salcido, or he, or one for whose conduct he is responsible knew his acts *** if you read those two in conjunction, I really can't see where you have any great problems."

The trial court, to resolve the question posed by the jury, did not confine itself to only rereading or redefining accountability for the jury. In addition, the court reread an issue instruction for murder which he followed by telling the jury to consider the two instructions together. By linking the two instructions together for the jury, we believe that the trial court obviated the potential for error which the defendant now argues. Linking the instructions made it clear that the jury could convict for murder by accountability only if defendant's unlawful restraint of some of the victims was intended to facilitate the murder of others. Therefore, we cannot accept the defendant's claim that the accountability instruction, as explained by the court, was so vague as to constitute reversible error.

As to the variation in the accountability instruction given from the IPI Criminal accountability instruction, defendant raised no question involving this variation in his original brief, which was filed in this court on May 11, 1983. Shortly before the defendant's brief was filed, the appellate court, in *People v. Terry* (1983), 113 Ill. App. 3d 302, 304-05, held that, under the facts of that case, giving an accountability instruction altered in the same manner as the instruction was altered here was error. In *Terry* this court allowed leave to appeal on May 31, 1983. (94 Ill. 2d

557.) Thereafter, the defendant, with leave of court, filed in this court a supplemental brief raising for the first time the alleged error in the giving of the altered accountability instruction. The State contends that any error in the giving of this instruction is waived by the defendant's failure to make a specific objection to the alleged error at the conference on instructions. We agree. At the conference on instructions the trial court, in settling the People's instructions, stated:

"No objections to Number 1, 2, 3, 4, no objection. Numbers 5, 6, 7, 8, 9, 10 are given over objection and basically the defendant objects to this one on the basis of accountability portion thereof."

Peoples instruction number 8 is the instruction now complained of.

To preserve for review an alleged error in an instruction, the grounds for the objection must have been specifically pointed out to the trial court so that court may have an opportunity to consider and correct the alleged error. (*Barrett v. Fitz* (1969), 42 Ill. 2d 529, 532-33; *People v. Hughey* (1943), 382 Ill. 136, 141-42; *McClure v. Suter* (1978), 63 Ill. App. 3d 378, 383; *Havlovic v. Scilingo* (1972), 7 Ill. App. 3d 918, 922.) Although the record reflects that there was a general objection to the accountability instruction, nothing in the record indicates that the specific nature of the objection was called to the trial court's attention. We must therefore hold that the specific error in this instruction now complained of has been waived.

Regardless of whether or not the instruction properly stated the law of accountability, the defendant was not prejudiced by the giving of this instruction. All of the evidence concerning defendant's involvement in the crimes clearly shows that he knowingly and willingly participated in the course of conduct intended by the participants to culminate in the killing of the three young men. From the time the four assailants conversed in Spanish, concluding

that they had to kill the three young men, until they procured Michael's socks from his suitcase and attempted to wipe the vehicle clean of fingerprints, discarded the knife and left the alley, there was no evidence that the defendant had any other criminal intent not related to the killings. When the defendant restrained Michael and Frank, it was not a simple unlawful restraint, it was for the purpose of aiding and abetting the murder of Arthur, and a part of the over-all plan to systematically kill all three. The evidence all clearly shows that the defendant was an active, willing participant in all three of these murders.

Defendant contends that the accountability instruction erroneously states the law. We call attention to the fact that this court has reversed the appellate court's holding in *Terry* relied on by the defendant. We approved the accountability instruction given in that case which was substantially the same as the instruction we are now considering. *People v. Terry* (1984), 99 Ill. 2d 508.

The defendant now contends that no further instruction should have been given to the jury. We point out that no further instruction on the law was given. That does not mean, however, that the court should not have aided the jury in resolving a question it had concerning the instructions. We find that the comments that the court made did no more than aid the jury in this regard. "The judge has a duty to respond to the jury's request with sufficient specificity to clarify the jury's problem." (*Davis v. Greer* (7th Cir. 1982), 675 F.2d 141, 145.) The jury's inquiry in this case indicated that it had a problem with the accountability instruction as it related to the murder of Arthur. The court reread to the jury the accountability instruction and the murder-issue instruction which related to Michael Salcido. The court then stated to the jury, as quoted above, that if it read these two instructions together, it didn't see how the jury could have any problem. We see no error in the court's attempt to aid the jury.

Nor do we find any error in the court's reading of the murder-issue instruction of Michael Salcido, rather than a generic murder instruction. In this case the court simply re-read an unobjectionable instruction which the jury already had before it.

The defendant also maintains that the judge's comments were prejudicial because he stated that the jury really should not have any problems. The defendant interprets these comments as telling the jury that it should not have a problem reaching a verdict under the facts of the case. We believe that any fair reading of those comments yields only the interpretation that the court was telling the jury that it really should not have a problem in understanding the law. As such, it was not comment on the evidence. Therefore, *People v. Golub* (1929), 333 Ill. 554, 561, where the court told the jury that " '[y]ou ought not to have any difficulty in reaching a verdict on this evidence,' " is not in point.

We next consider claimed errors regarding the imposition of the death penalty. The defendant argues that our statute does not authorize the death penalty to be imposed when the defendant has been convicted of murder on the basis of accountability. In *People v. Ruiz* (1982), 94 Ill. 2d 245, 260, we answered this contrary to defendant's contention.

The defendant also argues that a death penalty premised on accountability violates the due process clause of the Illinois Constitution. The defendant cites *People v. Wagner* (1982), 89 Ill. 2d 308, and *People v. Bradley* (1980), 79 Ill. 2d 410. These cases, in essence, hold that it is a violation of the due process clause to punish a less culpable crime more severely than a more culpable one.

The defendant attempts to bring himself within the ambit of those decisions by arguing that section 9—1(b)(6)(a) of the Criminal Code of 1961, which precludes the death sentence for felony murder if the defendant was not the

actual killer (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)), amounts to a legislative acknowledgment that the purposes of the penalty are not served by punishing by death a person who is accountable for one murder. Therefore, defendant asks us to strike down section 9—1(b)(3) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) as violative of due process insofar as it allows the death penalty to be imposed upon a person who is accountable for two or more murders. We do not find *People v. Wagner* and *People v. Bradley* helpful as supporting the defendant's contention.

We considered a similar argument in *People v. Ruiz* (1982), 94 Ill. 2d 245. We pointed out that in the felony murder the only intent necessary to support a conviction is that intent to commit the underlying felony. We distinguished *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, in which the Supreme Court had held that the defendant could not be sentenced to death based upon his conviction of felony murder when he had no intent to kill. We pointed out that Ruiz was not tried or convicted on the theory of felony murder and that the defendant Ruiz' conduct was such as to support the inference that he possessed the intent to take the lives of the victims. We also believe that defendant Caballero's intent to take part in the premeditated acts resulting in the deaths of the three youths was established beyond a reasonable doubt. We find no reason to alter our holding in *Ruiz* and we find that section 9—1(b)(3) of the Criminal Code of 1961 does not violate the due process clause of the Illinois Constitution.

The defendant also contends that impaneling a jury pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, results in a conviction-prone jury which is inconsistent with the need for effective and accurate jury verdicts as expressed in *Ballew v. Georgia* (1978), 435 U.S. 223, 55 L. Ed. 2d 234, 98 S. Ct. 1029. We rejected that claim in *People v. Lewis* (1981), 88 Ill. 2d 129,

147, and we do so again today.

A related contention also advanced by the defendant is that qualifying a jury under *Witherspoon* results in excluding certain representative members of the community (blacks and women) to such an extent that the defendant is denied his sixth and fourteenth amendment rights as enunciated in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692. The defendant has called our attention to the decision in *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, where the trial court accepted the theory that *Witherspoon* death qualification results in a "disproportionate exclusion of blacks and women" on the basis of attitudinal surveys. Qualifying a jury under the standards of *Witherspoon* does not, as defendant argues, exclude all who are opposed to the death penalty. It excludes only those who, regardless of the evidence, will not impose the death penalty. Thus, only those may be excluded who will not follow the law. Regardless of the *Grigsby* holding, we see no constitutional violation in excluding from the jury those who will not under any circumstances follow the law as given to them in the instructions. Until such time as the United States Supreme Court announces a new rule on jury qualification, we are unwilling to change our position.

Another jury-qualification issue raised by the defendant is the claim that the trial judge erred in failing to *sua sponte* "life qualify" the prospective jurors inasmuch as they were "death qualified." The claim is that "life qualification" should be done in order to exclude all jurors who feel that the death penalty should be automatically imposed in all murder cases. We considered and rejected this argument in *People v. Ramirez* (1983), 98 Ill. 2d 439, 459-60. In that case we stated that the defendant had not made any showing that any juror on his jury believed that the death penalty should be imposed in every case where the defendant is convicted of murder, and noted that just because a

juror is not opposed to the death penalty does not mean he is biased in favor of it. In our case the defendant has not shown or even suggested that there were on his jury any jurors who were biased in favor of the death penalty. We adhere to our holding in *Ramirez*.

The defendant next argues simply that the death penalty should not be imposed in this case. In considering this point, we must bear in mind that "[o]ur responsibilities *** neither require nor permit reversal where no reasonable doubt of guilt exists, no reversible error has occurred, and there is no indication that the jury imposed the penalty on other than a reasoned basis." *People v. Lewis* (1981), 88 Ill. 2d 129, 165.

The defendant urges that he should not be subjected to the death penalty because he was merely caught up in a tragic series of events which would not have occurred but for one of the victim's boast that he had killed friends of the defendant. This fact would be more compelling if the defendant had been shown to be a "follower" such as the defendant in *People v. Gleckler* (1980), 82 Ill. 2d 145, 164. However, no such evidence is present in this case. Instead, the evidence shows that the defendant encouraged a confederate to slash one of the victims' throats and then proceeded to slash another victim's throat himself. Further, Caballero is not a person without a criminal record, although it is not an extensive one. Also, the events which triggered the violence in this case are not of the same innocent nature as those in *People v. Carlson* (1980), 79 Ill. 2d 564.

In this case defendant exhibited no remorse. After giving a statement, the assistant State's Attorney asked him if he had to do it over "would he do it again." Defendant stated that he would "if it was a sure thing." The assistant State's Attorney then said "there is no such thing as a sure thing. You got caught." Defendant replied "a lot of Kings kill people without getting caught." The assistant

State's Attorney again replied: "Well, you got caught, Juan. Would you do it if you had to do it all over again." The defendant replied: "I'd kill Michael for sure, but I don't know about the other two."

The defendant also urges as mitigating factors that he was a good student until dropping out of high school and that he was not a disciplinary problem for his teachers or neighbors. The jury did not find these meager mitigating circumstances sufficient to preclude the imposition of the death penalty. In light of the vicious nature of the crimes, defendant's willingness to kill again and his lack of remorse, we see no reason to disturb the finding of the jury.

Also, we must point out that we have approved the death penalty for one of the defendant's confederates, Luis Ruiz, despite the fact that Ruiz was not shown to have actually stabbed anyone. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 267.) Caballero, on the other hand, has been established as the person who actually took the life of one of the victims.

For the foregoing reasons, we find that proper consideration was given to the facts and circumstances of the offense and to the defendant's character. We have not been shown any indications that the jury was moved to impose the death penalty on other than a reasoned basis. Accordingly, we hold that the death sentence is proper in this case.

The defendant's next claim is that he was denied a fair sentencing hearing because the State was allowed to open and close the arguments at the aggravation and mitigation phase of the sentencing hearing. The defendant concedes that our decision in *People v. Williams* (1983), 97 Ill. 2d 252, 302-03, rejects this claim but asks us to reconsider that decision in light of *People v. Bandhauer* (1967), 66 Cal. 2d 524, 426 P.2d 900, 58 Cal. Rptr. 332, *cert. denied* (1967), 389 U.S. 878, 19 L. Ed. 2d 167, 88 S. Ct. 178. In that decision, the California Supreme Court stated that, at

the penalty phase of the trial, the prosecutor no longer had the burden of proof "and there is no logical reason to favor one side over the other in argument." The California court then held that thereafter the prosecutor should open the argument at the penalty phase and the defendant could respond. The prosecutor could then argue in rebuttal and the defendant could then close in surrebuttal. We do not agree with the California court. If the prosecutor's rebuttal comments (closing comments) are properly limited to their intended purpose, there would be no reason to permit the defendant to address the jury further. In the normal course of a summation to the jury, of necessity, only one side may open. The other party then has the opportunity to reply to his opponents opening argument, and in turn make his own argument to the jury. The one who spoke first then has his opportunity to answer the argument of his opponent. No new material should be injected into this final statement. (75 Am. Jur. 2d *Trial* sec. 214 (1974).) There is therefore no reason to permit further argument which presumably could only be justified for the purpose of replying to something stated in the other person's final statement. If the closing arguments to the jury are properly limited, the contents of the "surrebuttal" that the California court is going to extend to the defendant can only be repetitious of what has already been stated.

We do not view giving one party both the opportunity to open and close as favoring one side or the other as the California court stated. If that were true, then all trials favor one side or the other. This is not the case. Properly controlled under accepted procedures, each party to a case has an opportunity to make his argument to the jury and each party has the opportunity to reply to the other party's argument. This is all any party has in any case regardless of who opens and closes. We therefore see no reason for departing from our holding in *Williams*.

The defendant has also raised several other issues relat-

ing to the death sentence which have been considered and rejected by this court in other cases. The defendant contends that the death penalty statute violates due process and the eighth amendment because it fails to require the State to prove beyond a reasonable doubt that no mitigating factors exist which are sufficient to preclude the death penalty. *People v. Brownell* (1980), 79 Ill. 2d 508, 531-34, and *People v. Kubat* (1983), 94 Ill. 2d 437, 504, answer that argument along with the argument that the defendant unconstitutionally bears the risk of nonpersuasion. The defendant also maintains that the death penalty statute is unconstitutional because it fails to restrict the jury to considering certain limited statutory aggravating factors. Allowing the jury to consider other aggravating factors is said to allow the death penalty to be imposed in an arbitrary or freakish manner. We rejected this claim in *People v. Free* (1983), 94 Ill. 2d 378, 427, and *People v. Kubat* (1983), 94 Ill. 2d 437, 504. The defendant also asks us to overrule the decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535, 539, which rejected claims that the death penalty statute includes an unconstitutional delegation of judicial sentencing power to the executive branch and also vests unconstitutionally broad discretion in the prosecutor in determining whether the death penalty shall be sought. We decline to do so.

The defendant maintains that the death penalty statute is unconstitutional because it fails to require pretrial notice of the State's intent to seek the death penalty. In *People v. Gaines* (1981), 88 Ill. 2d 342, 369, we addressed that issue. In *Gaines*, as in this case, the indictments charged the defendant with multiple murders. Defendant thus was aware that under our statute he could potentially be sentenced to death.

We also see no reason to depart from the holding of *People v. Gaines* (1981), 88 Ill. 2d 342, 372-74, that section 5—3—1 of the Unified Code of Corrections (Ill. Rev. Stat.

1979, ch. 38, par. 1005—3—1) has no application here. Casting the issue in constitutional terms does not change our holding, since the mitigating information that may be contained in a presentence report may, in a penalty hearing under section 9—1(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)), be presented to the jury.

We have also previously decided that our statute is not unconstitutional because it fails to require the sentencing body to make written findings regarding the existence or nonexistence of mitigating factors. *People v. Kubat* (1983), 94 Ill. 2d 437, 504; *People v. Gaines* (1981), 88 Ill. 2d 342, 383; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.

The defendant argues that the trial court incorrectly concluded that it was without the power to set aside the jury's verdict sentencing the defendant to death. He concedes that prior decisions of this court establish that the trial court is without such power (*People v. Lewis* (1981), 88 Ill. 2d 129, 147-48; *People v. Gaines* (1981), 88 Ill. 2d 342, 384). However, he argues that those decisions cannot be squared with our decision in *People v. Van Cleve* (1982), 89 Ill. 2d 298. In *Van Cleve*, we interpreted section 115—4(k) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 115—4(k)) to authorize a trial judge to set aside a jury's verdict of guilty. We do not view section 115—4(k) as being inconsistent with section 9—1(g) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g)), which makes a jury's findings binding on a judge in a death penalty hearing. Section 115—4(k) relates only to a finding or verdict of guilty. Section 9—1(g) does not relate to the guilt-innocence stage of the trial, but relates only to the penalty hearing in a death penalty case after there has been a finding of guilty. Our decision in *Van Cleve* is not inconsistent with our holdings in *Lewis* and *Gaines*.

The defendant has also raised one issue concerning his

conviction for armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A–2). He contends that his convictions for armed violence based on the underlying felony of unlawful restraint are improper because, in the information, he was charged with armed violence based on the underlying felony of murder. This variation is claimed to require reversal under the rule that a defendant cannot be convicted of a crime not charged in the information. *People v. Brown* (1924), 312 Ill. 63, 65.

Although three guilty verdicts were returned against the defendant for the offense of armed violence, no sentences were imposed on those verdicts. The final judgment in a criminal case is the sentence, and, in the absence of the imposition of a sentence, an appeal cannot be entertained. (*People v. Dixon* (1982), 91 Ill. 2d 346, 352; *People v. Warship* (1974), 59 Ill. 2d 125, 130; *People v. Lilly* (1974), 56 Ill. 2d 493, 496.) The defendant was charged with armed violence based on murder. The jury was instructed on armed violence based on unlawful restraint. The verdict of the jury simply found the defendant guilty of armed violence against each of the three men who were killed without specifying whether the armed violence was based on murder or unlawful restraint. The defendant did not specifically object to this apparent discrepancy in the instructions, which could have been cured if brought to the trial court's attention.

Although the notice of appeal in the record appeals from the three armed-violence convictions, the three unlawful-restraint convictions, as well as the three murder convictions and the death penalty, sentence was imposed only on the murder convictions. For this reason, the armed-violence convictions and the unlawful-restraint convictions are not before this court.

Appeals from the convictions of armed violence and unlawful restraint are therefore dismissed.

For the reasons set forth above, we affirm the defend-

ant's murder convictions and his sentence of death. We hereby direct the clerk to enter an order fixing the date of Wednesday the 26th day of September, 1984, as the date on which the sentence of death entered by the circuit court of Cook County shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119–5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119–5). A certified copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Appeal dismissed in part;*
*judgment affirmed in part.*

JUSTICE SIMON, dissenting:

I dissent. I believe that our death penalty statute is unconstitutional for the reasons I stated in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting) and *People v. Silagy* (1984), 101 Ill. 2d 147, 184-85 (Simon, J., dissenting).

I also disagree with the majority's suggestion in the instant case that counsel for the defendant in a capital case is under some obligation to file a post-trial motion in the trial court, thereby preserving only the most promising issues for review and relieving this court of some of its burden as a reviewing tribunal. (102 Ill. 2d at 31-32.) I do not believe the defendant should be forced to make a binding decision of this type in the trial court. Decisions as to which errors are the most serious are often best made only after a thorough review of the record, a review which may not be possible within the limited time the losing party has to file a post-trial motion, and which in some cases may be impossible because of delays in preparing the transcript of the trial. Procedures or rules of review which automatically limit a defendant who faces the death penalty to only those

issues which his attorney remembers well enough at the end of trial to make the basis of a post-trial motion, regardless of whether or not he chooses to file such a motion, would reduce the chances that an erroneous decision will be reversed.

Especially in an appeal involving the death penalty, I believe we should refrain from insisting that it is the obligation of counsel to file a post-trial motion which places him in peril of waiving any issues he may neglect to include in such a motion. Besides, it is useless to urge counsel to file such motions in cases where the death sentence has been imposed when, in the event they are not filed, we are nevertheless commanded by our constitution, as the majority concedes, to review all errors raised on appeal. Moreover, a defendant who elects not to file a written motion for a new trial is not precluded from appealing errors which occurred during the trial. (*People v. Pierce* (1980), 80 Ill. App. 3d 514, 516.) A defendant is free to choose between filing a written motion for a new trial, in which event he waives objections not included, and appealing without such a motion, in which event he waives nothing to which he has made a proper objection during the trial.

A mandatory limitation of the type the majority appears to suggest would be a sharp departure from our present system, which allows every losing party to frame his own post-trial strategy within the ordinary limitations of the waiver rule. A capital case, in which there is only one level of review at the State level and the consequence of losing is death, should not be the first in which such a novel departure is advanced.