THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID WILLIAMS, Defendant-Appellant.

First District (2nd Division)   No. 1—89—3112

Opinion filed September 15, 1992.

Michael J. Pelletier, Leslie Wallin, and Kenneth Jones, all of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant, David Williams, appeals his jury convictions for murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2). The victim, Gail Marshall, was shot and killed after the automobile she was driving collided with an automobile apparently driven by defendant. On appeal, he questions whether (1) he was denied his constitutional right to be present for jury selection; (2) the circuit court erred by refusing to give his tendered insanity instruction; (3) the court erred by admitting evidence of two unrelated crimes; (4) his inculpatory statements should have been suppressed; and (5) he was denied effective assistance of counsel.

A pretrial hearing was held on defendant's motion to suppress statements he made to police and assistant State's Attorneys, because of his alleged heroin and cocaine use prior to making the statements, his disturbed mental condition, and physical coercion by police. He also moved to suppress identification testimony.

Chicago police detective Ralph Vucko testified at the suppression hearing that while investigating Marshall's homicide on July 10, 1986, he met with defendant in an Area Four Violent Crimes interview room at approximately 4:45 p.m. Prior to preparing for lineups, defendant was fed and used the toilet. After the lineups, at 10 p.m.,

Vucko conversed with defendant for about one-half hour after defendant was given and understood his *Miranda* warnings and agreed to speak. At 1 a.m., Vucko and Assistant State's Attorney (ASA) Kip Owen, who also informed defendant of his *Miranda* rights, spoke with defendant for approximately one-half hour.

Chicago police detective James Mercurio testified that on July 11, 1986, at 9 a.m., he and his partner, Detective Thomas Lahm, saw defendant sleeping in the Area Four interview room. At 10 a.m., they gave defendant coffee, let him use the toilet and questioned him. Defendant understood his again-given *Miranda* rights and agreed to talk. After one-half hour, the officers contacted two more detectives and transported defendant to Jackson Boulevard and Pulaski Road, where defendant later admitted he had disposed of a gun. After buying defendant food and returning him to the interview room, Detectives Mercurio, Lahm and one of the other detectives searched defendant's apartment pursuant to a consent-to-search form executed by defendant. At 2 p.m., Mercurio returned to the station, again read defendant his *Miranda* rights and spoke with him for one hour, after which the detective telephoned an assistant State's Attorney from the felony review division. She arrived at about 4:15 p.m. and spoke with defendant at 6 p.m. for 30 to 40 minutes, after again giving him his *Miranda* warnings.

On cross-examination, Detective Mercurio asserted that during the 2 p.m. interview defendant claimed frequent heroin and cocaine use. He informed the detective of a person named "Harry" who was supposedly standing in the interview room behind defendant. No such person was present. Defendant asserted Harry looked like him with the same clothing, had a stronger and deeper voice, is a part of defendant's personality, and they use the same body. Defendant met Harry six months ago and since January 1, 1986, Harry had murdered seven people. Mercurio informed the assistant State's Attorney of these statements and of defendant's asserted drug use.

On redirect examination, Detective Mercurio testified that defendant told him he was driving with Harry, who saw a girl driving an automobile. He followed her on the expressway. Harry stated he was "going to take care of business" and got out of the car. Defendant heard two shots, went over to the car, put a gun in a bag and ran. When informed that witnesses saw defendant exit the vehicle alone, defendant sat still and described Harry as previously mentioned.

ASA Jane Loeb testified that on July 11, 1986, at 6 p.m., she spoke with defendant. She identified him in court. After receiving his *Miranda* warnings, defendant answered questions cooperatively,

alertly and appropriately. ASA Loeb did not recall being told of defendant's drug use, but was informed about Harry, described by defendant.

The two police officers, another detective, three police sergeants and the assistant State's Attorney, who saw defendant on July 10 and 11, testified that they did not personally physically abuse defendant nor to their knowledge did anyone else. Further, defendant did not appear to be under the influence of drugs and never requested an attorney. The parties stipulated that there were no allegations of physical coercion by the two arresting officers; therefore, they did not testify.

Defendant's motion for a finding as a matter of law at the close of the State's evidence in the suppression hearing was denied. He testified on his own behalf.

Defendant claimed that he used heroin and cocaine. He used one-half gram of heroin three times a day, which he took along with beer just prior to being arrested. After his arrest, defendant was removed to a police station where he was handcuffed to the wall and told that if he did not sign a consent-to-search form the police would break into his "crib" regardless. He complied. Next, he was brought to a second police station where he was handcuffed to the wall in an interview room.

Defendant asserted that the first two white detectives to testify questioned him individually. Defendant did not understand the questions because he was drugged. The detectives then interrogated defendant simultaneously, cursing him, hitting him and calling him "nigger" and "lying mother fucker." He was struck with a black mallet numerous times. Later, a black officer hit him with a fist. He did not understand further questioning because he was "high." He concealed 40 bags of heroin, worth $25 each, between his legs wrapped in plastic and foil, which he snorted when left alone on six or seven different occasions. He informed the first two detectives and the assistant State's Attorney that he had taken drugs.

Defendant told the officers that he did not commit the offenses charged. He made the statement concerning Harry because he was beaten and was mainly repeating what he was told to say. He did not remember being instructed to assert that Harry was standing behind him, wore the same clothing or looked like defendant, however, although he remembered uttering those words. He added that he had an unremoved bullet in his chest and underwent prior treatment for mental problems.

On July 17, 1986, defendant was removed by police from county jail without notice to defense counsel, placed in a lineup and interviewed by an assistant State's Attorney to whom he gave a statement.

The parties stipulated that an intake examiner would testify that on July 12, 1986, during an examination, defendant did not mention police officers hit him with a mallet or that a black officer hit him by hand. There were further stipulations as to photograph and lineup identifications of defendant.

The court denied defendant's motion to suppress his statement of July 11, 1986, but granted his motion to suppress his July 17, 1986, statement. His motion to suppress identification evidence was denied.

At trial, Chicago police officer Martin Summerville testified that at 4:30 a.m. on June 30, 1986, in response to a report of shots fired, he and his partner investigated and found a two-car accident at Karlov Avenue and Congress Parkway, involving a 1975 Chevrolet and a 1986 Oldsmobile. The Chevrolet was on fire with Marshall lying unconscious between the front seat and the dashboard. She had sustained several cuts and bruises, as well as a gunshot wound to her left breast. She was taken to the hospital. There appeared to be a bullet hole in the Chevrolet's windshield.

Annie Walker, the victim's mother, testified that on June 29, 1986, between 7 p.m. and 10 p.m., she saw the victim working at a restaurant, but next saw her dead at Cook County Hospital on June 30, 1986. Walker identified the victim's shoe bag, purse and apron. It was stipulated she would identify the victim in court, dead and alive, through photographs.

McCarthy Barry, one of Marshall's co-workers, testified that she drove him home after work at about 4 a.m. on June 30, 1986.

Odie Bowers testified that on June 28, 1986, at about 4:45 p.m., as he left a food store, defendant was standing next to Bowers' 1986 Oldsmobile and began asking him questions. As Bowers unlocked his car door, he felt defendant's gun in the back of his head. He threatened that if Bowers made a sound, defendant would blow his head off. Bowers was forced into the vehicle's passenger seat. Defendant drove. Upon demand, Bowers gave defendant his money, $15, which defendant ripped and threw, declaring he wanted "big money" to buy drugs. Defendant told him that he took the car to make money and that his gun was a nine millimeter. Bowers was let out and instructed not to go anywhere for one or two hours. Bowers identified defendant in a lineup and in court. He also identified a picture of his own automobile.

Henry King, Sr., testified that on June 30, 1986, at about 4:30 a.m., asleep in his apartment near the accident scene, he was awakened by a crash and gunshots. From his window, he observed two automobiles, an Oldsmobile and a Chevrolet. A heavyset man was pulling his head and arms out of the Chevrolet passenger window. The man walked away. Melony King, Henry's sister, at the same time awoke hearing the crash and gunshots. In addition to tracking Joe Jones' and Henry's testimony, she related that she identified Bowers' car, through a picture, as having been involved in the accident.

Joe Jones testified that, from his apartment window at about 4:30 a.m. on June 30, 1986, he observed a car "sitting" at Karlov and Congress when another vehicle, at a high rate of speed, made a right turn cutting it off. He heard a crash. After calling the police, three or four gunshots rang out. Jones returned to a window and observed a man walking across a vacant lot with a shoe bag, removing its contents, putting something in his pocket and dropping something else.

Chicago police detective Dennis Keane testified that he was assigned to the scene of the accident. The Chevrolet was damaged from the crash and fire. The front passenger-door window was broken out and a bullet hole was in the windshield. Two nine-millimeter shell cases were found in the automobile. Near a vacant lot, the detective found a shoe bag, a purse and a cosmetic bag. Marshall's identification, which included a bank card, was found in the purse. Keane identified Bowers' car as having been involved in the accident. Nine-millimeter live rounds were recovered from the automobile.

Chicago police crime laboratory technician John Stella testified that he inventoried the nine-millimeter cartridge cases and removed fingerprints from the inside surface of a window of the Oldsmobile. Walter H. Collins, a Chicago police crime laboratory technician, testified that fingerprints were recovered from the inside right rear opera window of the Oldsmobile.

Chicago police detective Anthony Mannina searched the Oldsmobile trunk and found clothing and other materials in two duffel bags containing items with defendant's name or nickname, including an inpatient appointment slip, a circuit court check, a medical eligibility card, voter and social security cards and a birth certificate. The addresses obtained from the materials were consistent with defendant's addresses.

Chicago police sergeant Michael Garner with his partner, Officer Kevin Russell, after having seen a police stop order and photograph, encountered defendant and brought him to the station at 3:30 p.m. on July 10, 1986.

The parties stipulated that the victim was dead from gunshot wounds in her back upon arrival at the hospital on June 30, 1986, at 5:31 a.m. Dr. Uepil Choi, an expert forensic pathologist, after a postmortem examination found gunshot-related wounds on the back and front of Marshall's left chest; small abrasions and lacerations on her forehead and chin; two lacerations on her left forearm; a small piece of glass embedded under her skin at a laceration; and a "V" shaped cut on her left wrist. A bullet jacket was recovered from her right upper back area, as well as a lead bullet core. In his opinion, she died of multiple gunshot wounds.

Chicago police officer Theatrice Patterson testified as an expert in the science of fingerprints that defendant's fingerprints matched that taken from the Oldsmobile window.

Chicago police officer Richard W. Chenow, testifying as an expert in the field of firearm identification, asserted that the cartridge cases found at the scene were ejected from the same firearm. The bullet jacket recovered from the right upper back of the victim is of the type loaded into the nine-millimeter cartridge cases found in the victim's car. The fired jacket had riflings consistent with being fired from a semiautomatic pistol.

Detective Vucko, in addition to relating substantially the same facts as testified to at the suppression hearing, asserted that he searched defendant's clothing and had him drop his pants and searched for contraband "there." Also, defendant denied committing the shooting.

Detective Mercurio added to his suppression hearing testimony that defendant admitted being at an attempted armed robbery eight minutes after the homicide. He was "by the restaurant" with a nine-millimeter semiautomatic handgun, ran across the street into an alley and threw the gun over a fence into a yard at Pulaski and Jackson. When the detective went with defendant to retrieve the gun, it was not there.

Betty Robinson testified that on June 30, 1986, at 4:45 a.m., she was working at a restaurant. She observed defendant as he stood on a street corner, crossed the street, walked by the door of the restaurant, came back to the door and then entered. He demanded her car. After she denied owning an automobile, defendant pulled out a gun and proceeded to the back of the restaurant where he told another worker to give him money, whereupon Betty ran. Defendant followed with a gun, stating that now he had to kill her. As she found the police, defendant entered an alley. Robinson identified defendant from a photograph array and a lineup, as well as in court.

Dr. Gerson Kaplan, a board-certified psychiatrist, testified that based upon three examinations, he believed defendant was malingering, had a substance abuse problem, an antisocial personality disorder, but was legally sane on June 30, 1986.

At the close of the State's case, the court denied defendant's motion for a directed verdict. The defense then proceeded by way of stipulation that Chicago police detective Raymond Leuser would testify to Melony King's report to him that the man she saw walking from the Chevrolet on June 30, 1986, appeared to be confused.

After having been found guilty, and following extensive testimony at his sentencing hearing, defendant received a sentence of natural life without parole in custody of the Department of Corrections for murder and 30 years for armed robbery, to be served consecutively.

### I

· Defendant maintains he was denied his constitutional right to be present at every critical stage of the trial, where court and counsel considered juror challenges and interviewed two challenged jurors outside of his presence.

*Voir dire* of 38 prospective jurors was conducted in the courtroom; however, the court questioned two prospective jurors in chambers in the presence of counsel for the State and the defense. There is no indication in the record that defendant was present for the questioning of these two jurors. One failed to note on his summons card that he had been arrested, charged and placed on supervision for "tampering with stolen goods" five years previously. He was excused by the State. The second juror allegedly was verbally addressed by defendant during a court recess. He was excused by the defense. The two prospective jurors subjected to *in camera voir dire*, having been excused, removed any potential adverse effect on jury impartiality.

■ Defendant was present as the court questioned each of the other prospective jurors in the courtroom. Any thoughts defendant may have had after the court questioned the jurors, which was done in his presence, easily could have been voiced to his counsel. The court announced, after nine prospective jurors were seated in the jury box, that "we are going to *** take a short recess for the lawyers to pass upon" those persons in the process of trying to "select twelve jurors." The actual challenges to prospective jurors were made by counsel for both sides and ruled upon by the court in chambers. No objection to this procedure was advanced by defendant or his counsel then or at a later recess called for similar purposes. A timely objection could have been considered by the court and ameliorative steps,

if any were required, could have been taken. Failure to raise any objection is sufficient to waive the point. Defendant cites *People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025, as authority for claiming waiver by the State for failure to raise this point in defendant's post-trial motion by addressing the merits of the motion. The State did not refer to the presence issue during post-trial argument and there was no State waiver.

Even when viewed from the standpoint of plain error (134 Ill. 2d R. 615(a)), the result is the same. Defendant maintains that he was prejudiced because he did not have meaningful and reasonable input into deciding who would sit on the jury; he does not claim, however, that his jury was not impartial. His argument is based upon his right to be present at the time actual challenges to prospective jurors were announced by counsel and ruled upon by the court. Defendant has a general right to attend every stage of his trial, including jury selection. (*People v. Bean* (1990), 137 Ill. 2d 65, 560 N.E.2d 258.) The situations are limited, however, in which denial of this broad right of presence constitutes a violation of the Illinois and United States Constitutions. The United States and Illinois Constitutions guarantee defendant an impartial jury, not a jury of his choice. (*Bean*, 137 Ill. 2d at 85.) The issue raised by defendant's claim, whether the exclusion denied defendant trial by an impartial jury (*Bean*, 137 Ill. 2d at 81, 85), must be answered here in the negative. Defendant's absence at that stage of the proceedings could not have adversely affected the impartiality of the jury.

Defendant's absence from chambers was undesirable, and in some cases such absence may constitute the denial of a defendant's constitutional rights. Under the circumstances here, however, no sufficient basis to question the jury's impartiality has been presented requiring his conviction to be overturned.

## II

Defendant contends that the circuit court erred in refusing to give his proposed insanity instructions because the affirmative defense of his insanity was before the jury.

At trial, Detective Mercurio asserted that defendant told the police someone named Harry shared defendant's body and personality and that Harry was standing behind defendant in the interrogation room. After this testimony, over defendant's objection, the court allowed Dr. Kaplan to testify. The court ruled the jury had a right to know that the doctor examined defendant because his mental "wherewithal" was already before the jury. Dr. Kaplan testified that defend-

ant was antisocial, pretending to be mentally ill and abusing street drugs. He added that defendant was legally sane at the time of the homicide and mentally fit when examined.

The court subsequently refused to give the jury instructions as to defendant's insanity. Based upon Dr. Kaplan's testimony, the court found that there was absolutely no evidence before the jury implying defendant was anything but sane at all times during the incident, thereby barring insanity instructions from being given.

■ As postulated in *People v. Moore* (1986), 147 Ill. App. 3d 881, 498 N.E.2d 701, *appeal denied* (1987), 113 Ill. 2d 581, defendant must prove, more likely than not, that he was insane when he committed the offenses charged. Defendant is entitled to instructions on insanity only where a jury's finding of insanity would be supported by a preponderance of the evidence. Jury consideration of such an affirmative defense, then, is precluded where, as here, the court finds there was insufficient evidence presented to warrant a reasonable person's belief that defendant had proved the affirmative defense by a preponderance of the evidence. (*Moore*, 147 Ill. App. 3d at 886.) Defendant failed to present any evidence at trial probative of his insanity and Dr. Kaplan's testimony clearly supports the court's refusal to tender insanity instructions.

■ Defendant insists that in light of section 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—4) (section 115—4(j)), *Moore* could not be construed to have precluded defendant's tendered jury instructions. Section 115—4(j) provides that when the affirmative defense of insanity has been presented during trial the court *shall* provide the jury with a verdict form for not guilty by reason of insanity. The operative word in section 115—4(j) is "presented." Insanity instructions should be given when the affirmative defense has been presented. There was insufficient evidence to support a jury's finding of insanity by a preponderance of the evidence here; therefore, the affirmative defense was not presented so as to require the court to give insanity instructions to the jury. (See *Moore*, 147 Ill. App. 3d 881, 498 N.E.2d 701.) Such a result is not inconsistent with the requirements of section 115—4(j).

### III

Defendant contends that the circuit court erroneously permitted the State to introduce at trial evidence of two allegedly separate, unrelated offenses, the armed robbery of Odie Bowers and the attempted armed robbery of Betty Robinson. Both Bowers and Robinson identified defendant as the offender in each instance.

The court admitted evidence of the offense against Bowers, stating Bowers' identification of defendant as the person who took his automobile would be relevant to circumstantially establish that defendant was in possession of Bowers' vehicle at the scene of the homicide two days later, finding that the probative value of Bowers' testimony would outweigh its prejudicial effect. The crime against Robinson took place shortly after and in close proximity to the homicide, making Robinson's testimony probative of identity by placing defendant in the vicinity of the offenses at issue, the court finding that its probative value outweighed its prejudicial effect. The court denied defendant's motion *in limine* and instructed the jury to consider evidence of the other crimes only for purposes of identification, motive and design.

■ Evidence of other crimes or wrongful conduct is not admissible to show defendant's character or propensity to commit crime or wrong acts. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292.) It may be used to prove presence of criminal intent, placement of defendant in proximity to the time and place of a crime, common design, identity and motive. (*People v. Stewart* (1984), 105 Ill. '2d 22, 473 N.E.2d 840; *Kimbrough,* 138 Ill. App. 3d 481, 485 N.E.2d 1292.) As the circuit court here reasoned, evidence regarding the taking of Bowers' automobile as well as defendant's statements to Bowers were clearly relevant to the identification of defendant as the murderer. Furthermore, Robinson's testimony identified defendant as present, near the scene, in flight and with a gun. Although proximity alone is not sufficient to admit evidence of other crimes, such evidence may be admitted when the other crime is relevant for additional reasons, as here, to demonstrate identity. *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. (*Kimbrough,* 138 Ill. App. 3d at 489.) The circuit court here properly weighed these two factors and did not abuse its discretion in denying defendant's motion *in limine. People v. McCoy* (1987), 156 Ill. App. 3d 194, 199, 509 N.E.2d 567.

## IV

Defendant asserts that inculpatory statements he made while in custody should have been suppressed because they were not voluntarily given.

On July 11, 1986, at 2 p.m., defendant gave to Detective Mercurio a statement regarding Harry and the shooting. This statement was alleged to have been involuntarily given because of the conditions of his

detainment and because his will was overcome. Immediately prior to the nearly 24 hours that police interrogated him, beginning at 3:45 p.m. on July 10, 1986, defendant claims he took heroin and drank beer. His drug use allegedly continued while alone in custody as he snorted heroin, which he hid between his legs. Defendant maintains he ate only twice, slept in a chair and was questioned numerous times, adding that he did not understand the questions asked of him because he was "high." Defendant urges that Detective Vucko's claim that he searched defendant for contraband, instructing him to drop his pants, was evidence of an intrusive coercive element of defendant's detention which was unnecessary because defendant was not arrested for possession of contraband. In the alternative, defendant asserts the search was fabricated to negate his testimony regarding the use of drugs in the police station.

The State has the burden of establishing by a preponderance of the evidence that confessions are voluntary. (*People v. Caballero* (1984), 102 Ill. 2d 23, 33, 464 N.E.2d 223; *People v. Mackey* (1990), 207 Ill. App. 3d 839, 859-60, 566 N.E.2d 449.) The circuit court found that no physical violence was inflicted upon defendant while he was in custody and that there was no credible evidence to suggest that defendant was unable to understand his rights, voluntarily relinquish them and give a statement. This determination was not against the manifest weight of the evidence and will not be overturned. *Caballero*, 102 Ill. 2d at 33.

■ Defendant was fed shortly after his arrest, given the opportunity to use the toilet, and was read and understood his *Miranda* warnings numerous times. Neither the police officers nor the assistant State's Attorney knew of defendant being physically abused or observed him while under the influence of drugs during their investigations. The totality of the evidence supports the court's finding that defendant's statements were made freely, voluntarily and without compulsion, and that defendant's will was not overborne.

## V

Defendant asserts that he was denied effective assistance of counsel, in violation of the sixth amendment to the United States Constitution.

As grounds for the foregoing allegation, defendant points to defense counsel's alleged failure to communicate with him; counsel's strong suggestions that he avoid trial by pleading guilty because he otherwise would receive the death penalty; counsel's alleged failure to ask witnesses questions posed by him; and counsel's failure to inform him of the jury questioning which took place out of his presence. Defendant

stresses that his lawyer chose not to respond to the above allegations when made, in part, before the court and that the court was forced to explain jury waiver to defendant because his counsel failed to do so. These allegations were first made on the day the case was set to go to trial.

To sustain a claim of ineffective assistance of counsel, defendant must prove that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive him of a fair trial. Defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246.) The inquiry generally will not extend to exercise of judgment, discretion, trial tactics or strategy, however. (*People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882, 522 N.E.2d 1317.) The accused is entitled to competent, not perfect, representation, and the fact that a defense tactic was unsuccessful does not retrospectively demonstrate incompetence. *Schmidt*, 168 Ill. App. 3d at 882.

■ Despite defendant's allegations, the record reveals his counsel represented him for three years and he never before complained. A second defense lawyer also saw him five times in the months previous to trial. Being warned by counsel of the potential result of trial is not incompetence any more than suggesting alternatives to trial. Defendant did not reveal to the court what questions he wanted asked but stated, "[t]hey are not important, things I had asked you [the court], papers and stuff I asked for *** so I can read over it and stuff." The court, after considering defendant's complaint, found that defense counsel provided more than adequate competent representation. The trial record reveals that counsel presented numerous motions on defendant's behalf, challenged prospective jurors during *voir dire*, vigorously cross-examined witnesses, argued a logical theory of defendant's case and zealously represented defendant at the sentencing hearing.

The preceding considerations demonstrate that defendant was not denied a fair trial and there is no reasonable probability that the result would have been different with other legal representation.

No bases have been identified which would justify reversal of the judgment. Accordingly, the convictions and sentences must be affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.