# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Murdock*, 2012 IL 112362

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GERMILL D. MURDOCK, Appellant. |
| Docket No. | 112362 |
| Filed | November 1, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The circumstances that no juvenile officer, parent, or other concerned adult was present when a minor gave custodial statements did not call for a finding of involuntariness where the totality of the evidence at the suppression hearing indicated otherwise. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Peoria County, the Hon. Michael Brandt, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |

| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Peter A. Carusona and Thomas A. Lilien, Deputy Defenders, and Fletcher P. Hamill, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant. |
| | |
| | Lisa Madigan, Attorney General, of Springfield, and Jerry Brady, State's Attorney, of Peoria (Michael A. Scodro, Solicitor General, and Michael M. Glick and Matthew P. Becker, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | |
| Justices | JUSTICE GARMAN delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Thomas and Karmeier concurred in the judgment and opinion. |
| | Justice Burke dissented, with opinion, joined by Justices Freeman and Theis. |

## OPINION

¶ 1    Defendant, Germill D. Murdock, was convicted following a jury trial in the circuit court of Peoria County of first degree murder and aggravated battery with a firearm. Defendant's conviction was affirmed on appeal. Defendant then filed a postconviction petition alleging trial counsel was ineffective for failing to move to suppress statements defendant had made to police. Defendant, a juvenile, alleged his statements were the product of police coercion that rendered them involuntary. After conducting an evidentiary hearing, the trial court denied defendant's petition. The appellate court reversed and remanded to the trial court for a suppression hearing. Following the suppression hearing, the trial court denied defendant's motion to suppress. The appellate court affirmed the denial of the motion to suppress. No. 3-07-0438 (unpublished order under Supreme Court Rule 23). Defendant appeals, arguing his statements were involuntary, primarily due to the absence of a concerned adult during his police detention. For the following reasons, we affirm the decisions of the trial court and appellate court.

¶ 2                                    BACKGROUND
¶ 3    Defendant, a 16-year-old juvenile, was indicted on October 9, 2001, in Peoria County on one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2000)), one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2000)), and one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2000)) related to the death of Eric Eppinger and wounding of Sam Clark, Jr.

¶ 4		Defendant's first two jury trials resulted in mistrials due to deadlocked juries. Defendant's third jury trial began in March 2003. Evidence presented by the State established that on September 4, 2001, defendant drove Shereaf Fleming and Cortez Trapps to Logan Park in Peoria, Illinois. Upon arriving at Logan Park, Trapps and Fleming produced guns, pulled their shirts up to obscure their faces, and left defendant's vehicle. Trapps and Fleming approached the victims, Eric Eppinger and Sam Clark, Jr., who were sitting in parked cars, side by side, speaking to one another. Trapps and Fleming approached and began firing at Clark and Eppinger, wounding Clark and killing Eppinger. Trapps and Fleming returned to defendant's vehicle, and the three left the scene.

¶ 5		At issue was whether, when he drove them to Logan Park, defendant knew about or was involved in Fleming and Trapps' plan to shoot Eppinger. In support of its theory of the case, the State produced oral, written, and videotaped statements made by defendant to Peoria detective Michael Mushinsky on September 19, 2001, after defendant was involved in a traffic stop and was brought to the police station. At the station, Mushinsky advised defendant that he was investigating the murder of Eppinger and advised defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant indicated he understood his rights and would talk to Mushinsky.

¶ 6		Mushinsky informed defendant of what he (Mushinsky) knew about the case. Defendant told Mushinsky he did not shoot Eppinger, that he had just been the driver of the van, and that Cortez Trapps was the actual shooter. Mushinsky then asked defendant to explain exactly what happened. Defendant said he was told by Trapps and Fleming that Eppinger was at Logan Park. They wanted defendant to drive them to Logan Park and said they were going to shoot Eppinger. Defendant told them he did not want to drive them, but they told him to drive to Logan Park anyway. Defendant drove Fleming and Trapps to Logan Park, where they spotted Eppinger's vehicle. Fleming told defendant to drive the van into the alley and park. When defendant parked, Fleming and Trapps put white shirts over their faces and pulled out guns. Trapps and Fleming then walked in the direction of Logan Park. After a minute defendant heard gunshots and Trapps and Fleming came running back to the van. Trapps and Fleming got back in the van and told defendant to drive away. Trapps said he had killed Eppinger and Fleming said he fired one shot, but then his gun jammed. Defendant said Trapps and Fleming went after Eppinger because Eppinger and Kimmett Scott had tried to rob Trapps and Fleming on an earlier occasion.

¶ 7		After Mushinsky's interview with defendant, defendant provided a written statement. The written statement basically reiterated what defendant had told Mushinsky orally. Defendant told Trapps and Fleming not to go after Eppinger, but still drove them to Logan Park. After the shooting, defendant drove them to "Erica's" house, where Trapps and Fleming put the guns in a paper bag at the back of the house.

¶ 8		Defendant also signed a video release form giving police permission to videotape a third statement. Before recording the video, Mushinsky read defendant a form which again stated his *Miranda* rights.

¶ 9		On the video (as transcribed by the court reporter), Mushinsky noted it was 9:45 p.m. on September 19, 2001, in Room 164 of the Peoria police department, 600 SW Adams Street

in Peoria. Present for the interview were Mushinsky, defendant, and video technician Detective Grow of the Peoria police. Mushinsky again read defendant his *Miranda* rights as they related to a videotaped statement, and defendant indicated he understood and waived his rights. Defendant stated that he was answering Mushinsky's questions voluntarily and of his own free will. Defendant agreed that he had not been struck, beaten, abused, or threatened by anyone to obtain the statement. He had not been promised immunity from prosecution or leniency by any police officer. He had been allowed to go to the bathroom, eat, and drink if he so needed.

¶ 10    Defendant stated that on Tuesday, September 4, 2001, Trapps and Fleming told him to "come on" and "not to worry about" where they were going. As defendant drove the van, Fleming said he knew where Eppinger could be found. They went to Logan Park and drove by Eppinger, who was sitting in his Cadillac. Defendant was directed by Fleming to park in the alley. Once defendant parked, Fleming and Trapps pulled their white T-shirts up over their faces and pulled out guns. The two jumped out of the van and ran toward Logan Park. Defendant heard a few shots and a minute later Trapps and Fleming ran back to the van. They told defendant to drive and defendant drove back to Erica's house. In the van, Trapps said he thought he killed Eppinger. Trapps and Fleming put the guns and white T-shirts they had worn for the shooting in a bag and took it with them to the back of Erica's house. After a while Trapps and Fleming left while defendant stayed behind at the house. Trapps and Fleming returned to Erica's after an hour and a half and picked up defendant and the van.

¶ 11    According to defendant's statement, prior to their arrival at Logan Park, neither Trapps nor Fleming said anything to him about shooting Clark. Defendant first saw the guns when he pulled into the alley. Trapp and Fleming removed the guns from a bag they had hidden under the seat in the van. Defendant suspected Trapps and Fleming had brought the guns into the van without his knowledge by hiding them under their shirts. Upon seeing Eppinger in his vehicle at Logan Park, Fleming said "we fixing to get him," referring to Eppinger. Defendant believed Fleming and Trapps wanted to shoot Eppinger because Eppinger had tried to rob them at a Holiday Inn prior to the shooting. After the video concluded, it was entered into evidence.

¶ 12    On cross-examination, Mushinsky insisted that the date of defendant's oral confession, in which he admitted that he knew Trapps and Fleming planned to kill Eppinger as he drove them to Logan Park, was September 19, 2001, even though the report of the oral confession was marked "9-21." Mushinsky admitted that during the taped confession he asked no direct questions related to what defendant knew about Trapp and Fleming's plans to shoot Eppinger as he drove them to Logan Park. On redirect examination, Mushinsky explained that secretaries type the reports, which could account for the date discrepancy.

¶ 13    Peoria police Detective Craig Willis was the final State witness. Willis was present at the interview of defendant on September 19, 2001. According to Willis, defendant said that while he was in the van with Trapps and Fleming on the way to Logan Park, they told defendant they were going to shoot Eppinger. Defendant said he tried to talk them out of the shooting. The State then rested.

¶ 14    Defendant did not take the stand. He was convicted of first degree murder and aggravated

battery with a firearm and was sentenced to consecutive terms of 24 years for the murder and 8 years for the aggravated battery.

¶ 15    Defendant filed a direct appeal raising a single issue: whether trial counsel was ineffective for failing to file a motion to suppress defendant's statements. The appellate court, in an unpublished Rule 23 order, affirmed defendant's conviction, finding that his claim of ineffective assistance would be better raised in a postconviction proceeding, where defendant could develop a factual record. *People v. Murdock*, No. 3-03-0494 (2004) (unpublished order under Supreme Court Rule 23). Defendant filed his *pro se* postconviction petition on May 24, 2005. In the petition, defendant argued that "trial counsel rendered ineffective assistance by failing to file a motion to suppress defendant's statements to the police, and to challenge their admissibility." In support of his contention that his statements were involuntary, defendant noted that there was no juvenile officer present and he did not have an opportunity to speak with his grandmother. On June 16, 2005, the circuit court found that the issues raised in the petition precluded summary dismissal and appointed counsel.

¶ 16    A postconviction evidentiary hearing on defendant's petition began on May 4, 2007, before a different judge. Following the presentation of evidence, the trial court denied defendant's postconviction petition.

¶ 17    On appeal, the appellate court reversed the trial court and remanded the matter for a full suppression hearing as to defendant's September 19, 2001, statements to police. The appellate court noted that the "concerned adult" factor, while not dispositive of the voluntariness of a juvenile's confession, is nonetheless important. The court found that under the totality of the circumstances, the trial court's findings that defendant could not have prevailed on a motion to suppress was erroneous, and remanded the matter to the trial court to conduct a suppression hearing.

¶ 18    A motion to suppress was filed, alleging that defendant, a juvenile, was subject to lengthy questioning by the police. The motion further alleged that defendant was held "incommunicado" and confessed only after certain promises were made to him by police. (The motion does not specify exactly what promises were made.)

¶ 19    The suppression hearing was held on January 21, 2010, before a third judge. The only witness called by the State was Mushinsky. Mushinsky testified that he first came into contact with defendant in an interview room of the Peoria police department on September 19, 2001, at around 5:30 p.m. Mushinsky had issued a "probable cause message" for defendant because he had probable cause to believe, after talking with witnesses, that defendant had been involved in a homicide that took place in Logan Park. Defendant was not handcuffed, but he was not free to leave the interview room. Mushinsky asked defendant if he wanted anything to eat or drink. Defendant declined but Mushinsky had already ordered him food. Mushinsky began to interview defendant at 6:45 p.m., accompanied by Detective Willis. Prior to asking defendant any questions, Mushinsky read him the *Miranda* warnings from a preprinted card. Defendant indicated he understood and agreed to speak to Mushinsky. Mushinsky told defendant he had spoken to other people, such as Fleming, and told defendant what they had told him.

¶ 20    At no point that evening did defendant request to see either of his grandparents.

Defendant's grandfather Milas Murdock did come to the police station. Mushinsky needed to speak with him about an issue in the case and he wanted to inform Milas that defendant was at the station. Milas never requested to speak with defendant. Defendant did not request to speak with Milas and, prior to giving his statements, did not request to see an attorney. Defendant at no point during the interview refused to speak with Mushinsky. Mushinsky did not make any promises to defendant, nor did he threaten or coerce defendant in any way. Defendant never appeared in distress. Before the videotaped statement, defendant was given a video *Miranda* form and signed it. The interview of defendant concluded around 10:30 p.m. Defendant had been allowed to use the restroom.

¶ 21    On cross-examination, Mushinsky testified that if defendant had so requested, he would have been allowed to see a parent or guardian. Defendant would not have been free to leave. Mushinsky said that during the interview he was acting as both the investigating officer and the juvenile officer. Mushinsky denied ever saying defendant would not be charged if he would give up "the trigger man."

¶ 22    Defendant next took the stand. He testified that he was picked up by the police at around 2:35 p.m. on September 19, 2001, following a traffic stop. Defendant was handcuffed and taken to the police station, arriving there at about 3:15 p.m. From 3:15 to 5:30 p.m., defendant was not allowed to see a parent or guardian, even though he had made a specific request to see his grandmother, Dottie Robinson. Defendant was afraid. Mushinsky re-entered the room at 6:45 p.m. and began talking to defendant about the Eppinger murder, without reading *Miranda* rights to him. Mushinsky told him that he would not be charged if he gave up the "trigger man," and he would be allowed to go home. Defendant made two requests to see a parent or guardian: once when Mushinsky was out, he knocked on a door and made the request of a guard, and then once later to Mushinsky. Defendant was nervous and scared while making the video statement. Mushinsky read *Miranda* warnings to defendant before the recording, but defendant testified that he did not really understand the warnings. Mushinsky never told defendant that he did not have to talk to the police if he did not want to. Defendant felt tired and drained.

¶ 23    On cross-examination, defendant's October 2001 letter to Judge Lucas[1] was introduced. In the letter defendant asserted that he knew nothing about the intentions of Trapps and Fleming when he drove them to Logan Park. He also claimed he asked police to call his grandmother when he was arrested on September 19, 2001, but his requests were refused. Instead police told him they would call his grandfather. Defendant was not able to see his grandfather while he was in police custody. Defendant claimed that he was scared and mentioned that the police promised him freedom if he told them who shot Eppinger and if he would admit to driving the shooter to the scene. Defendant claimed he had never been in trouble and had never been to jail. The letter was entered into evidence following the close

---

[1]Defendant's first two trials were before a different judge than his third trial. The postconviction proceedings were before a third judge, and the motion to suppress hearing was conducted before a fourth judge. Defendant appeared before Judge Lucas for a bond hearing on September 21, 2001, but Judge Lucas was not the judge at any of defendant's three trials.

of testimony.

¶ 24　　The trial court issued its ruling denying the motion to suppress on January 28, 2010. The trial court articulated its reasons for denying the motion in open court and on the record. The court noted that any consideration as to whether statements should be suppressed is determined by whether the statements were voluntary or coerced. Because defendant was a juvenile, greater care must be taken to ensure that the statements were not the result of fright, ignorance of rights, or adolescent flights of fantasy. A number of factors needed to be weighed, with no single factor being dispositive. After reviewing the law and carefully considering the evidence presented at the hearing, particularly the videotaped statement, the court found the statements were voluntary because defendant had the mental capacity to understand his situation. Defendant was also able to understand the proceedings and his rights. The court further found that defendant was able to make his own voluntary decisions and statements. Defendant clearly answered and understood *Miranda*. Observing defendant's demeanor on the videotape, the court found that, while he had been at the station a few hours, defendant's will was not overcome. Sitting at the station for an hour gave defendant a chance to reflect. Nothing on the tape indicated defendant was afraid. He appeared to be calm. Officers allowed him restroom breaks and food, even if he did not take advantage of them. There was no yelling or badgering by officers. There were no threats on the part of the officers. The trial court also expressed doubts about defendant's credibility.

¶ 25　　Three aspects of defendant's statements did concern the trial court. First, Mushinsky was "wearing two hats" as juvenile officer and investigating officer. The trial court, however, determined that a juvenile officer would not have done anything differently because the interview was proper and "by-the-book." Next, a parent or guardian should have been contacted. It was unclear to the trial court how the grandfather, Milas Murdock, came to be at the police station, whether Milas was contacted by Mushinsky or if Milas learned of defendant's detention through other means. However, there was no evidence the grandfather was denied the opportunity, if he requested, to see defendant. Finally, the trial court noted the supposed promise made by Mushinsky to induce defendant to give the statement. Mushinsky denied making the promise. The trial court found Mushinsky more credible on this point, and even if the promise had been made, the trial court did not feel it would have been sufficient to overcome the voluntariness of defendant's statements.

¶ 26　　The appellate court affirmed the denial of the motion to suppress, holding that "[g]iving the trial court's findings their due deference, we consider the findings were not against the manifest weight of the evidence and conclude the trial court's denial of Murdock's motion to suppress was not made in error." No. 3-07-0438 (unpublished order under Supreme Court Rule 23). Justice McDade dissented, writing that she would have found that Mushinsky did not act as a juvenile officer. Further, she would have found that the length of the interview overcame defendant's will and rendered the statements involuntary.

¶ 27　　　　　　　　　　　　　　　　　ANALYSIS

¶ 28　　Defendant contends that the trial court erred in denying his motion to suppress. Specifically, defendant argues that the record establishes that his statements to the police

were involuntary because he, a juvenile, was interrogated as an adult. The State counters that defendant's statements were voluntary and the trial court was correct in denying the motion to suppress.

¶ 29    "In reviewing a trial court's ruling concerning whether a confession is voluntary, the trial court's factual findings will be reversed only if those findings are against the manifest weight of the evidence." *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). Ultimately, however, the trial court's ruling on whether the confession was voluntary is subject to *de novo* review. *Id*.

¶ 30    To determine the voluntariness of a confession, courts consider the totality of the circumstances, including such factors as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. *Id*. Other factors include the duration and legality of the detention and whether there was any physical or mental abuse by the police. *Id*. Threats or promises made by the police may be considered physical or mental abuse. *Id*. No single factor is dispositive, rather "[t]he test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." *Id*.

¶ 31    Defendant concedes that Detective Mushinsky did not engage in any behavior that would be considered coercive when applied to an adult. However, defendant argues that he was a juvenile, 16, at the time of the interrogation, and that the Supreme Court of the United States has recognized that "special caution" is required when reviewing the voluntariness of a minor's confession. See *Haley v. Ohio*, 332 U.S. 596, 599 (1948).

¶ 32    This court most recently addressed the voluntariness of custodial statements made by juveniles in *In re G.O.*, 191 Ill. 2d 37 (2000), and *Morgan*. The taking of a juvenile's confession is a sensitive concern, and for this reason the greatest care must be taken to assure that the confession was not coerced or suggested. *Id*. at 54. The confession should also not be the product of adolescent fantasy, fright, or despair. *Id*. Illinois courts have recognized an additional factor not applicable in cases involving adults: the presence of a "concerned adult." *Id*. at 54-55. This factor considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. *Id*. at 55. In weighing this factor, courts also consider whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the concerned adult's attempt to confer with the juvenile. *Id*.

¶ 33    However, a juvenile's confession or statement should not be suppressed merely because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation. *Id*. The concerned adult factor is particularly relevant in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with a concerned adult, or the police prevent the concerned adult from speaking with him. *Id*. The concerned adult factor is just one of the many factors to be examined when determining whether a juvenile's confession was voluntary. *Id*.

¶ 34    As a preliminary matter, defendant argues this court should consider, in its review of the denial of the motion to suppress, evidence presented at hearings other than the suppression hearing. Specifically, defendant argues that we should consider the testimony of his

grandmother, Dottie Robinson, from the earlier postconviction evidentiary hearing.[2] In support of this contention, defendant cites to *People v. Caballero*, 102 Ill. 2d 23 (1984). In *Caballero*, the defendant was convicted at a jury trial after a pretrial motion to suppress oral and written confessions had been denied. On appeal to this court, the defendant argued that testimony elicited during the suppression hearing that police had beaten him had gone unrebutted. The only rebuttal to his abuse testimony came during the trial, when one of the officers testified that he never struck the defendant. *Id*. at 33. The defendant argued that a court of review is limited to considering evidence presented at the suppression hearing and to evidence introduced at trial *prior* to the admission of the allegedly illegally obtained confession. The State countered that an appellate court may consider *all* evidence presented at trial in addition to the evidence from the suppression hearing. *Id*. at 34.

¶ 35    This court agreed with the State, holding that it would " 'consider all of the evidence, both at the hearing on the motion and at the trial, to determine whether the trial court properly admitted in evidence' " the confessions. *Id*. at 36 (quoting *People v. La Bostrie*, 14 Ill. 2d 617, 620-21 (1958)). Much of the court's discussion centered around whether it was proper to consider testimony *before* or *after* the contested confessions were admitted into evidence at trial. The court determined it did not matter and that, on review, the court may consider all trial evidence in determining whether the trial court's decision denying a motion to suppress was correct. *Id*.

¶ 36    This court revisited *Caballero* in a later decision, *People v. Brooks*, 187 Ill. 2d 91 (1999). In *Brooks*, the defendant relied on evidence elicited at *trial*, not the suppression hearing, to argue that his motion to suppress was erroneously denied by the trial court. The defendant argued that, in ruling on the trial court's decision on a motion to suppress, the reviewing court could consider evidence introduced at trial as well as the suppression hearing. This court disagreed, however, noting that in the cases cited by defendant "the courts relied on trial testimony to *affirm* the trial court's denial of a motion to suppress. Defendant is asking us to *overturn* the trial court's ruling on the motion to suppress based on evidence that came out at trial." (Emphasis in original.) *Id*. at 127. The court wrote:

> "The analysis is different in this situation. When a reviewing court affirms a trial court's suppression ruling based on evidence that came out at trial, it is akin to a harmless error analysis. The reviewing court is essentially saying that whether the court's decision was supported by sufficient evidence at the suppression hearing becomes irrelevant when evidence to support the trial court's decision is introduced at trial. One reason this is so is that the pretrial ruling on a motion to suppress is not

_____

[2]Robinson had testified that she was called to the station by defendant on September 19, 2001. Upon arriving at the station, she informed the receptionist that she was defendant's grandmother and wished to see him. She was told to have a seat and wait. Sometime later a detective came out and informed her he was questioning defendant. Despite telling the detective she wished to see defendant, she was never afforded the opportunity. On cross-examination, Robinson admitted that while she was not defendant's legal guardian, he was living with her at the time of his arrest. Robinson expressed uncertainty as to whom she spoke with at the police station and whether defendant was released to her on September 19, 2001.

final and may be changed or reversed at any time prior to final judgment. [Citation.] We do not believe that this reasoning applies equally when a defendant is asking us to rely upon trial evidence to reverse a trial court's decision on a pretrial suppression ruling, particularly when the defendant fails to object when the relevant evidence is introduced." *Id*. at 127-28.

¶ 37 Further, in finding some of the defendant's arguments waived, the court wrote:

"Defendant cites no authority for the proposition that a court can consider evidence argued for the first time on appeal in considering a trial court's ruling on a motion to suppress. To be reviewed on appeal, evidence must have been presented to the fact finder at trial [citation], and arguments made for the first time on appeal are waived [citation]." *Id*. at 128.

¶ 38 Here, the procedural posture is different from that facing the court in *Brooks*. Dottie Robinson's testimony was not from a trial held after a suppression hearing, but rather from the evidentiary hearing on the postconviction petition held a few years before the suppression hearing and heard by a different judge. Further, unlike the situation in *Caballero*, defendant is asking this court to use evidence from a prior hearing to overturn the trial court's ruling on a motion to suppress, so this would not be "akin to a harmless error analysis." *Id*. at 127. Dottie Robinson did not testify at the suppression hearing and, it appears from the record and Justice McDade's dissent, the trial court was not made aware of her testimony. We can only speculate as to why Robinson did not testify at the suppression hearing. Whatever the reason for the absence of Robinson from the suppression hearing, the evidence was not presented to the fact finder and will not be incorporated in our review on appeal. See *id*. at 128.

¶ 39 Thus, in this appeal, we are reviewing only the decision of the trial court from the suppression hearing of January 21, 2010. The facts that inform our analysis are only those facts in evidence at that hearing. The trial court made its factual and legal determinations based solely on that evidence.

¶ 40 We must first decide whether the determinations made by the trial court as to credibility and findings of fact were against the manifest weight of the evidence. Having reviewed defendant's videotaped statement and having reviewed the transcripts from the hearing and evidence of record, the trial court's factual determinations were not against the manifest weight of the evidence. We agree with the trial court that Mushinsky was more credible than defendant. As noted by the trial court in its ruling, during direct examination defendant testified that Mushinsky never read defendant *Miranda* warnings before talking to him and taking his oral and written statements. However, on cross-examination defendant was impeached with his testimony from the postconviction evidentiary hearing, where he admitted *Miranda* warnings were read to him before Mushinsky asked him any questions.

¶ 41 We agree with the trial court that Mushinsky made no promises to defendant, and see no reason to disturb the trial court's credibility determination on this point. On direct examination Mushinsky testified that he made no promises of leniency to defendant in exchange for information. When asked on cross-examination about whether defendant was promised freedom if he "g[a]ve up the trigger man," Mushinsky replied that defendant's claim was "absolutely false." Mushinsky testified that he "already knew who both trigger

men were by the time" he talked to defendant. Defendant testified on direct examination that Mushinsky promised him, before the video statement was recorded, that he could go home if he "helped [Mushinsky] get the trigger man." On cross-examination, however, defendant conceded that on the videotape, when asked by Mushinsky if he had been promised anything in exchange for providing a statement, defendant answered "no." Also, on direct examination, when asked if it was "really brought home to him" that he did not have to talk to the police if he did not want to, defendant said "no" and that Mushinsky never told him that. However, on the videotape, when asked if he understood that he did not have to talk to Mushinsky or answer his questions unless he voluntarily chose to do so, defendant immediately and clearly answered "yes." Defendant claimed he only said "yes" on the videotape because he was tired and he thought Mushinsky would let him go.

¶ 42    We also agree with the findings made by the trial court regarding the videotape. Defendant claimed at the suppression hearing that, when the video was made, he was "tired and scared." Defendant claimed he did not really understand the *Miranda* rights Mushinsky was reading to him. Defendant's statements are belied by his appearance on the videotape. Defendant's overall demeanor during the interview is calm. Defendant does appear somewhat nervous at times, but no more nervous than would be anyone else in his situation. Defendant appears able to understand his situation and the questions posed to him. Defendant is able to provide answers in a clear, narrative structure. Defendant does not appear on the videotape to be in any sort of physical or mental distress. He does not appear to be exhausted or in any sort of suggestive state. He does not appear to misunderstand or be confused by any of the questions asked by Mushinsky. Defendant never asks Mushinsky to repeat a question. We can find no reason, based on the transcripts and videotape, to disturb the trial court's findings of fact. The trial court's factual findings are not against the manifest weight of the evidence.

¶ 43    Thus, based on the facts established at the suppression hearing, the question before this court is whether, under the totality of the circumstances, the statements defendant made to Mushinsky on September 19, 2001, were voluntary. The trial court's ruling on this issue is reviewed *de novo*. *Morgan*, 197 Ill. 2d at 437.

¶ 44    Upon review, we agree with the trial court that the totality of the circumstances indicate defendant's statements were voluntary. We first consider defendant's age, experience, educational background, and intelligence. Defendant, at 16, is on the older end of the juvenile scale. While he did testify that he attended Greeley Alternative School, it is not clear if he attended because of learning difficulties or behavioral problems. Defendant, in his brief, notes that his presentence investigation report showed he had only completed one semester of high school and had poor grades. However, based on the evidence from the suppression hearing and videotape, defendant was able to understand and give full, concise, and clear answers to questions posed to him. While in his letter to Judge Lucas defendant claimed to have never been in trouble with the police before, he did not appear to misunderstand or be confused by Mushinsky's questions or the discussion of *Miranda* rights. Thus, defendant appears to be of normal intelligence and mental capacity for someone his age.

¶ 45    Second, there is no evidence of physical or mental abuse. Defendant testified that Mushinsky made promises to him that he would be released if he gave information on the

shooter, but the trial court found Mushinsky more credible on this matter than defendant, and we see no reason to disturb the trial court's finding in that regard. Mushinsky testified that he never made any threats toward defendant. Defendant was not handcuffed during the interview. On the videotape, Mushinsky's tone with defendant is conversational, not confrontational. There is no evidence that any sort of police trickery was employed to extract information from defendant. The absence of trickery weighs in favor of voluntariness. See *In re Marvin M.*, 383 Ill. App. 3d 693, 705 (2008) ("A final factor to consider, for both juveniles and adults, is the presence of police trickery and deceit.").

¶ 46    Third, we consider defendant's physical condition. Defendant did appear nervous at times during the videotaped statement, but some nervousness on defendant's part is not inconsistent with voluntariness. On the videotape, defendant does not appear to be sweating or shaking. He does not appear to be in any type of distress. Rather, defendant appears for the most part calm and alert. He does not appear tired or exhausted. Mushinsky testified that defendant was offered food, drink, and the opportunity to use the bathroom. Based on the videotape and the testimony of Mushinsky, which the trial court found more credible than that of defendant, defendant was in good physical condition during his detention and interview.

¶ 47    Fourth, the length of defendant's detention and interview does not render his statements involuntary. The seven-hour duration of defendant's detention is somewhat lengthy. However, Mushinsky testified that he only interviewed defendant from around 6:45 to 10 p.m. that day, and that based on Mushinsky's recollection, defendant was in the interview room from about 5:30 p.m. to 10 p.m. the day of September 19, 2001. Weighing in favor of voluntariness, the interview was conducted in the evening hours, instead of, for example, the very early morning hours, when sleep deprivation can lead to a potentially more coercive environment. See *Haley*, 332 U.S. at 599-600; *People v. McDaniel*, 326 Ill. App. 3d 771, 786 (2001). Defendant's total time of detention was less than 12 hours.[3] Defendant was detained for six to seven hours. The interview took place in the evening and the actual interview only lasted three hours. The interview time was reasonable and we cannot say it contributed to a coercive atmosphere that would render defendant's statements involuntary. See *G.O.*, 191 Ill. 2d at 56 (finding that the length and duration of custody weighed in favor of voluntariness where juvenile had been in custody for roughly six hours before confessing and was questioned from around 12:30 a.m. to 4 a.m., since "[a]lthough [the juvenile] was in the police station for several hours, he was questioned for only a short period of time on only three or four occasions"); *Marvin M.*, 383 Ill. App. 3d at 706 (finding that a three-hour interrogation of a juvenile defendant, from 5:30 p.m. to 8:30 p.m., was reasonable).

¶ 48    Defendant argues that the major factor rendering his statements involuntary was the absence of a concerned adult, beginning with no juvenile officer being present during his

_____

[3]The relevant section of the juvenile code in effect at the time defendant was detained reads: "Except as otherwise provided in paragraph (a), (d), or (e), no minor shall be detained in a county jail or municipal lockup for more than 12 hours, unless the offense is a crime of violence in which case the minor may be detained up to 24 hours." 705 ILCS 405/5-410(2)(c) (West 2000).

detention. The relevant section of the juvenile code in effect at the time of defendant's detention states:

> "(2) A law enforcement officer who arrests a minor without a warrant under Section 5-401 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for these purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/5-405(2) (West 2000).

¶ 49    In Illinois, two lines of cases have developed as to the role of a juvenile officer: one line of cases holds that a juvenile officer's role is to verify that a juvenile's parents have been notified, ensure that the juvenile has been given *Miranda* rights, and ensure that the juvenile is properly treated, fed, given access to the restroom facilities, and not coerced. *People v. Minniti*, 373 Ill. App. 3d 55, 73 (2007) (recognizing the lines of cases); *People v. Williams*, 324 Ill. App. 3d 419, 429-30 (2001); *People v. Plummer*, 306 Ill. App. 3d 574, 588 (1999). Another line of cases holds that a juvenile officer must take a more active role and "demonstrate an interest in the minors' welfare and affirmatively protect their rights." *Minniti*, 373 Ill. App. 3d at 73; *McDaniel*, 326 Ill. App. 3d at 785; *In re J.J.C.*, 294 Ill. App. 3d 227, 237 (1998). Although Mushinsky testified that he was trained as a juvenile officer, defendant argues that Mushinsky could not "wear two hats": Mushinsky could not be the lead investigator interviewing defendant while at the same time being a juvenile officer.

¶ 50    We agree with defendant that, in this case, Mushinsky was not acting as a juvenile officer. Even under the more lenient standard, Mushinsky cannot be said to have been acting in his role as a juvenile officer. In *People v. Griffin*, 327 Ill. App. 3d 538 (2002), the juvenile officer, Begeske, despite acting as a juvenile officer in the sense of being present for most of the defendant's interrogation and making sure the defendant understood his *Miranda* rights, admitted to actively participating in the investigation. *Id.* at 548. The appellate court found that actively investigating the case was incompatible with the officer's role as a juvenile officer, stating:

> "[W]e find that Begeske failed to fulfill his duties under either of the above standards [*i.e.*, the two lines of cases that have developed as to the proper role of a juvenile officer]. Begeske did not remain a neutral observer but, rather, worked against defendant's interests. While an investigator's role is to interrogate witnesses and collect evidence, it is clear that the role of a youth officer is to act as a concerned adult interested in the juvenile's welfare. A youth officer cannot be adversarial or antagonistic toward the juvenile. [Citation.] Thus, these roles are inherently incompatible. Youth officers cannot act in their role as a concerned adult while at the same time actively compiling evidence against that juvenile.
>
> Here, Begeske admitted that, while he was acting as the only youth officer to seven juveniles including defendant, he actively investigated this case. He

-13-

'Mirandized' and interrogated several witnesses, continued his investigation of the shooting outside the station, and executed a search at a codefendant's relative's house for the murder weapons. Accordingly, we hold that Begeske was not an adult concerned for defendant's welfare. Rather, he contributed to the coercive atmosphere surrounding defendant's confession. We note that, with this holding, we do not mean to suggest that youth officers must act solely in that capacity and cannot also investigate crimes. They may continue their investigations on other, unrelated matters while acting as youth officers." *Id*. at 547-48.

¶ 51    We find the above reasoning sound. While Mushinsky did read defendant his *Miranda* rights and ascertained that defendant understood those rights, Mushinsky was actively investigating the case and he abandoned his role as a juvenile officer when he began questioning defendant about his role in the shooting of Eppinger and Clark. Mushinsky was not merely a juvenile officer standing by while another officer took the lead in interviewing defendant; rather, Mushinsky was the lead interviewer. It was Mushinsky who obtained defendant's oral and written statements and asked defendant questions on the videotape. Mushinsky could not act as a juvenile officer or concerned adult while at the same time compiling evidence against defendant. See *Id*. at 547. Since no juvenile officer was present in the room with defendant, we need not determine which line of appellate court decisions relating to the proper role of a juvenile officer is correct.

¶ 52    However, in this particular case the detrimental effect of a juvenile officer's absence is mitigated. The factual findings of the trial court crediting Mushinsky's testimony, which we have found to be supported by the manifest weight of the evidence, establish that defendant was given *Miranda* rights, properly treated, offered food, given access to restroom facilities, and not physically or mentally threatened. While the presence of a juvenile officer is a significant factor in the totality of the circumstances argument, there is no requirement that a juvenile officer be present when a minor is questioned, and the absence of a juvenile officer will not make a juvenile's statements *per se* involuntary. *Minniti*, 373 Ill. App. 3d at 73. Thus, although the absence of a juvenile officer weighs against voluntariness, that absence did not so contribute to a coercive atmosphere that defendant's statements were rendered involuntary.

¶ 53    The other aspect of the concerned adult factor at issue is whether defendant was denied access to his grandfather Milas Murdock. Defendant's grandfather did not testify at the suppression hearing. Mushinsky's testimony relating to defendant's grandfather at the station was as follows:

> "Q. He didn't ask to see his grandfather?
>
> A. No.
>
> Q. Was his grandfather at the police station at that time?
>
> A. Yes, his grandfather was also at the police station. I needed to speak to him about an issue in this case, and also I wanted to inform him that Mr. Murdock was there.
>
> Q. And what was that individual's name?
>
> A. Milas Murdock.

Q. You informed him that Germill Murdock was at the police station?

A. Yes.

Q. Did Milas Murdock ever request to speak with the defendant?

A. No.

Q. Did the defendant ever request to speak with Milas Murdock?

A. No."

¶ 54 The trial court noted, and we agree, that it is unclear from Mushinsky's testimony just how the grandfather came to be at the police station. What is clear from Mushinsky's testimony is that Milas Murdock never requested to see defendant. Mushinsky stated that if Milas had asked to see defendant, he would have been allowed to do so. However, while Mushinsky did not affirmatively deny Milas Murdock the ability to see defendant, Mushinsky apparently took no steps to inform Milas that he had the right to speak to defendant if he desired. Although Mushinsky should have informed Milas that he could speak with defendant if he so desired, this is not a situation where a police officer affirmatively refused to let a concerned adult see a juvenile defendant. See *Griffin*, 327 Ill. App. 3d at 546 (finding the police frustrated parents' attempts to see juvenile in order to create an intimidating atmosphere and obtain a confession where chief of police refused to allow them to see their son); *J.J.C.*, 294 Ill. App. 3d at 236-37 (finding that an atmosphere coercive enough to overcome the juvenile's will was created when, after the parents arrived at the station and informed police of their desire to speak with their child, the police told the parents to wait, but never allowed them to see the juvenile). The ability of a juvenile to speak with a concerned adult is a relevant factor in determining whether a juvenile's confession was voluntary, but it is not dispositive and is just one of many factors for the court to consider. *G.O.*, 191 Ill. 2d at 55. In his brief defendant acknowledges that, standing alone, the absence of a concerned adult does not automatically render a minor's statement involuntary. Here, the absence of a concerned adult weighs against voluntariness, but under the facts of this case, there is no evidence a concerned adult's absence caused defendant's will to be overcome.

¶ 55 Under the totality of the circumstances, we find defendant's statements to be voluntary. In a motion to suppress, the true test of voluntariness is whether the defendant " 'made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [defendant's] will was overcome at the time he or she confessed.' " *G.O.*, 191 Ill. 2d at 54 (quoting *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996)). No single factor is dispositive, and each case is fact specific and must be evaluated on its own specific set of circumstances. *Minniti*, 373 Ill. App. 3d at 73. In this case, the absence of a concerned adult did not create a coercive atmosphere so as to render defendant's statements involuntary. Defendant was able to clearly communicate with Mushinsky and understand the questions posed to him. He was able to understand and give assent to a waiver of his *Miranda* rights. On tape defendant appeared mostly calm and collected. He did not appear frightened or under any intense coercion. Defendant was never threatened physically or mentally and Mushinsky made no promises or assurances to defendant so as to contribute to a coercive atmosphere. Defendant was allowed access to food, drink, and restrooms. We find that, despite the absence of a

concerned adult, defendant's statements were the result of his own decision and that at no point during the interview was defendant's will overborne. Under the totality of the circumstances, and considering all the factors, defendant made his statements freely and voluntarily and absent any compulsion or inducement.

¶ 56    For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 57    Appellate court judgment affirmed.

¶ 58    JUSTICE BURKE, dissenting:

¶ 59    I disagree with the majority's conclusion that the matter for review in this case is "the decision of the trial court from the suppression hearing of January 21, 2010," and that the "facts that inform our analysis are only those facts in evidence at that hearing." *Supra* ¶ 39. This result finds no support in our postconviction jurisprudence. The majority fails to recognize that the appellate court erred in remanding the cause for a suppression hearing after a third-stage, postconviction hearing had already been held to address the defendant's sixth amendment claim of ineffective assistance of counsel. The matter for review in this case should, therefore, be the trial court's decision denying the defendant's petition for postconviction relief, and the facts that inform our analysis should consist of the facts in evidence at the postconviction hearing. Based on that record, I would hold that the defendant is entitled to relief on his claim that his trial counsel provided ineffective assistance of counsel when he failed to file a motion to suppress.

¶ 60                                      I

¶ 61    On the evening of September 4, 2001, Eric Eppinger and Sam Clark, Jr., were sitting in their cars in Logan Park in Peoria, Illinois. Two gunmen, Shereaf Fleming and Cortez Trapps, emerged from a nearby alley, shot and killed Eppinger and wounded Clark. Fleming and Trapps then returned to the alley and drove away in a van driven by the defendant, 16-year-old Germill Murdock.

¶ 62    Defendant was twice tried in the circuit court of Peoria County on the theory that he drove Fleming and Trapps to Logan Park with the knowledge they planned to shoot the victims and, therefore, was accountable for the crimes. Mistrials were declared in both trials after the juries could not reach a verdict. Following a third trial, defendant was convicted of first degree murder and aggravated battery with a firearm.

¶ 63    The evidence against defendant consisted largely of defendant's own admissions, contained in both written and videotaped statements made to the police, and a subsequent letter written to the judge who presided over defendant's preliminary hearing. The most important evidence, however, were statements made by defendant during his initial interview with Detective Michael Mushinsky of the Peoria police department. During this interview, according to Mushinsky, defendant stated that he knew the gunmen were going to shoot the victims. This admission did not appear in the letter, written statement or videotaped

statement.[4]

¶ 64    On direct appeal, defendant raised the single issue of whether he received ineffective assistance of counsel when his trial attorney failed to file a motion to suppress defendant's oral statement. The appellate court, however, declined to reach the issue, stating that the record before it was inadequate to resolve defendant's claim. Citing *Massaro v. United States*, 538 U.S. 500 (2003), the court concluded that defendant's claim was better suited for a collateral proceeding, "where the facts supporting the claim could be fully developed." *People v. Murdock*, No. 3-03-0494 (2004) (unpublished order under Supreme Court Rule 23). Accordingly, the appellate court affirmed defendant's convictions while indicating that he was free to file a postconviction petition.

¶ 65    Defendant subsequently filed a postconviction petition in which he again alleged that he received ineffective assistance of counsel. The circuit court advanced the claim to the third stage of postconviction proceedings and conducted an evidentiary hearing. At the hearing, defendant, defendant's grandmother, defendant's trial counsel, and Mushinsky all testified. At the conclusion of the hearing, the trial court found that defendant's attorney "had nothing to lose by pursuing" suppression of defendant's statement, and counsel's failure to do so could "hardly" be considered trial strategy. Accordingly, the trial court concluded that counsel's performance was deficient under *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 66    With respect to prejudice, the court found that defendant had failed to produce "sufficient grounds to say that the oral statement would have been suppressed." The court noted that the "rights of the defendant were complied with in terms of *Miranda* warnings, and no threats or coercing or anything of that nature" occurred. Because the motion to suppress would not have been allowed, the trial court concluded that defendant had failed to establish a reasonable probability that the outcome of the trial would have been different and, therefore, denied the postconviction petition. Defendant appealed.

¶ 67    After reviewing the evidence, the appellate court determined that "the totality of the circumstances indicates that the trial court's finding that [defendant] could not have prevailed on a motion to suppress was erroneous." *People v. Murdock*, No. 3-07-0438 (2009) (unpublished order under Supreme Court Rule 23). However, rather than holding that the unargued motion to suppress was meritorious, the appellate court stated only that defendant had shown a "reasonable probability" of succeeding on the motion. *Id.* From this, the appellate court held that "the trial court erred in failing to conduct a suppression hearing" and remanded the cause so that one could be held. *Id.*

¶ 68    A suppression hearing was held, at which only defendant and Mushinsky testified. The trial court denied defendant's motion to suppress. On appeal, the appellate court affirmed, with one justice dissenting. No. 3-07-0438 (unpublished order under Supreme Court Rule 23). This appeal followed.

---

[4]At the subsequent postconviction hearing, defendant's trial attorney testified that he spoke with jurors after both mistrials and they indicated they could not reach a verdict because of problems with the credibility of the police.

-17-

¶ 69                                    II

¶ 70    Defendant contends that our review of this case should not be limited to the evidence produced at the suppression hearing but, instead, should include evidence introduced at the postconviction hearing. The majority rejects defendant's argument, and concludes that we may review only the evidence introduced during the suppression hearing. *Supra* ¶¶ 34-39. I disagree.

¶ 71    The United States Supreme Court has explained that, in order to establish *Strickland* prejudice with regard to the failure to seek the suppression of evidence, a defendant must prove that the unargued suppression motion is "meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). See also, *e.g.*, *People v. Bailey*, 232 Ill. 2d 285, 289 (2009); *People v. Harris*, 182 Ill. 2d 114, 146 (1998); *People v. Moore*, 171 Ill. 2d 74, 108 (1996); *Rann v. Atchison*, 689 F.3d 832, 835 (7th Cir. 2012). When a defendant proceeds with the claim of ineffective assistance of counsel on postconviction, the postconviction hearing is used to determine the merits of the motion to suppress. See *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 Tenn. Crim. App. LEXIS 707, at *24 ("In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing."). If, at the conclusion of the postconviction hearing, the trial court determines that the motion to suppress lacks merit, then prejudice is necessarily absent. If, however, the trial court determines that the motion is meritorious, then it must decide whether there is a reasonable probability that the outcome of the trial would have been different in the absence of the contested evidence.

¶ 72    The appellate court, on review from the denial of defendant's postconviction petition, did not apply the correct legal standard. The question for the appellate court was whether defendant had established reasonable probability that the outcome of *the trial* would have differed. To answer that question, the appellate court had to decide, as the Supreme Court has explained, whether the motion to suppress was meritorious.

¶ 73    Instead of fulfilling its obligation, the appellate court remanded the matter to the trial court for a suppression hearing. In support of its decision to remand, the appellate court cited to *People v. Cokley*, 211 Ill. 2d 589 (2004) (table). In that case, the appellate court, on direct review, had granted the defendant relief on his claim that his trial counsel was ineffective for failing to file a motion to quash the defendant's arrest and suppress evidence. The relief was granted over the State's objection that no evidentiary hearing had been held to address the question and, therefore, it could not be properly resolved on direct review. The State then filed a petition for leave to appeal. This court entered a supervisory order issued upon the denial of the petition for leave to appeal, directing the appellate court to remand the cause to the circuit court to conduct a hearing on the unargued suppression motion.

¶ 74    The appellate court's reliance on *Cokley* is clearly misplaced for a number of reasons. Supervisory orders are not precedential (*Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 221 (2008)), and *Cokley* should not have been cited for that reason alone. Further, the concern in *Cokley* was that no evidentiary hearing had been held to address the defendant's claim of ineffective assistance of counsel. That is not the case

here, where a postconviction hearing was held specifically to address the merits of the suppression motion within the context of defendant's ineffective assistance claim.

¶ 75 The appellate court was therefore simply incorrect when it stated, on review from the denial of defendant's postconviction petition, that "the trial court erred in failing to conduct a suppression hearing." There was, in fact, no further hearing to conduct. It was defendant's burden to show, in the postconviction hearing, that the unargued suppression motion was meritorious and that there was a reasonable probability that the verdict would have been different absent the contested evidence. On review, the appellate court should have decided whether that burden had been met. The appellate court clearly erred in ordering a hearing to determine whether the suppression motion was meritorious, after a hearing to answer that very question had already been held.

¶ 76 The majority fails to acknowledge the fundamental errors contained in the appellate court's analysis of defendant's postconviction claim. This oversight leads to the unusual and untenable position in which the majority now finds itself: the majority is reviewing a "free standing" fourth amendment claim that the trial court erred in denying a motion to suppress, wholly outside the context of the sixth amendment claim of ineffective assistance of counsel that was actually raised in defendant's postconviction petition.[5] Even more troubling is the majority's refusal to consider any of the evidence introduced at the third-stage, postconviction evidentiary hearing—the very hearing that was held to address defendant's postconviction claim.

¶ 77 The matter for review in this case should be the trial court's decision denying the defendant's petition for postconviction relief, and the facts that inform our analysis should consist of the facts in evidence at the postconviction hearing.

¶ 78                                    III

¶ 79 Defendant's postconviction petition alleges that his trial counsel was constitutionally ineffective for failing to file a motion to suppress oral statements made during his interview with Mushinsky. To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that prejudice resulted from that deficiency. *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 80 At the conclusion of the postconviction hearing the trial court found that counsel's failure to file a motion to suppress was objectively unreasonable and amounted to deficient performance. This conclusion was affirmed by the appellate court (*People v. Murdock*, No. 3-07-0438 (2009) (unpublished order under Supreme Court Rule 23)), and is not contested by the State.

¶ 81 With respect to prejudice, defendant must show that the unargued suppression is meritorious and that there is a reasonable probability that the outcome of the trial would have

---

[5]Indeed, nowhere in the majority opinion is there a reference to *Strickland v. Washington*, 466 U.S. 668 (1984), or the standards set forth in that opinion governing sixth amendment claims of ineffective assistance of counsel.

been different absent the excluded evidence. Defendant maintains that the oral statements made during his interview with Mushinsky were involuntary as a matter of Illinois law and, therefore, should have been suppressed.

¶ 82    The taking of a juvenile's confession is " 'a sensitive concern.' " *In re G.O.*, 191 Ill. 2d 37, 54 (2000) (quoting *People v. Prude*, 66 Ill. 2d 470, 476 (1977)). In analyzing the voluntariness of a juvenile's confession, courts must take great care to assure that these statements were not suggested or coerced, or a product of fright or despair. *People v. Kolakowski*, 319 Ill. App. 3d 200, 213 (2001). Courts look to the totality of the circumstances in determining whether a juvenile's confession is voluntary. Because a juvenile is " 'an easy victim of the law,' " his confession will be found involuntary if the facts reveal that it was " 'a confession wrung from a child by means which the law should not sanction.' " *In re V.L.T.*, 292 Ill. App. 3d 728, 736 (1997) (quoting *Haley v. Ohio*, 332 U.S. 596, 599, 601 (1948)).

¶ 83    Defendant's principal argument regarding the motion to suppress is that he was interviewed by the police in violation of section 5-405 of the Juvenile Court Act of 1987 (705 ILCS 405/5-405 (West 2000)). That statute provides:

> "(2) A law enforcement officer who arrests a minor without a warrant under Section 5-401 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for these purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/5-405(2) (West 2000).

Defendant notes that both his grandmother and grandfather, with whom he resided, were present at the police station but were not permitted to see him. Defendant contends that the violation of section 5-405 weighs heavily in finding his statement involuntary.

¶ 84    At the postconviction hearing, defendant's grandmother, Dottie Robinson, gave the following testimony:

> "Q. As far as when you came to the police station, did you tell them you were his grandmother?
>
> A. Yes, I did.
>
> Q. And did you tell them that you wanted to see your grandson?
>
> A. Yes.
>
> Q. Did you tell them that he was living with you?
>
> A. No, I didn't tell them that.
>
> Q. And did you tell them that he had called and wanted to see you?
>
> A. Yes.
>
> Q. And what did they say to you when you told them all that?

-20-

A. They told me to have a seat, that someone would come and get me.

Q. Did a detective come out and speak to you?

A. He came out and said that he was questioning him regarding something that—that had happened, and that he was questioning him about that.

Q. And did you say that you wanted to see him?

A. Yes.

Q. And what did the detective say to you?

A. Well, I didn't get to see him."

Mushinsky gave the following testimony regarding defendant's grandfather:

"Q. During any of this time was there any effort to contact his caretaker?

A. I believe at the time this grandfather, Mil[a]s Murdock, was at the Peoria Police Department also. I don't recall the exact time he arrived, but I know that I spoke to him that day as well.

Q. And was he allowed to talk to [defendant]?

A. He didn't ask to, no.

Q. Did you tell the young man that his grandfather was at the station?

A. I don't recall.

Q. Did you ask the grandfather whether he wanted to talk to his grandson?

A. I know I advised him he was there. I don't recall if I specifically said would you like to speak with him. I know he did not request to be in the interview with him."

Mushinsky further stated that he knew defendant was living with his grandparents at the time of the interview.

¶ 85    At the conclusion of the postconviction hearing, the trial court found that the police had plainly violated section 5-405, stating there "was no testimony at all that the officer even arguably complied with Section [5-]405, notifying any juvenile officer or notifying a parent or guardian in this case."

¶ 86    This court has held that the "concerned adult" factor, *i.e.*, whether the juvenile had an opportunity to speak with a parent or adult interested in his welfare before or during interrogation, is an important element in determining the voluntariness of defendant's confession. *In re G.O.*, 191 Ill. 2d at 55. While the failure to allow a juvenile to meet with a concerned adult prior to questioning does not render a confession *per se* involuntary, courts have repeatedly held that police conduct which frustrates a concerned adult's attempts to confer with the minor is particularly relevant and a significant factor in the totality of the circumstances analysis conducted under Illinois law. *In re G.O.*, 191 Ill. 2d at 55; *People v. Griffin*, 327 Ill. App. 3d 538, 545 (2002); *People v. McDaniel*, 326 Ill. App. 3d 771 (2001); *People v. Golden*, 323 Ill. App. 3d 892 (2001); *Kolakowski*, 319 Ill. App. 3d at 214; *In re J.J.C.*, 294 Ill. App. 3d 227, 235 (1998); *In re Lashun H.*, 284 Ill. App. 3d 545, 553 (1996). "It suggests that, at worst, the police were trying to coerce a confession and at best that they were conducting the interrogation without due regard for the suspect's age." *In re R.T.*, 313

Ill. App. 3d 422, 430 (2000) (citing *In re V.L.T.*, 292 Ill. App. 3d at 737, *In re Lashun H.*, 284 Ill. App. 3d at 554-55, and *People v. R.B.*, 232 Ill. App. 3d 583, 595 (1992)). The fact that a defendant does not request to confer with the concerned adult is irrelevant when considering whether the statute has been violated. *McDaniel*, 326 Ill. App. 3d at 783 (citing *In re J.J.C.*, 294 Ill. App. 3d at 237). When a juvenile's parents or guardians are present, request to see their child, and are prevented from doing so by the police, the presumption arises that the juvenile's will was overborne. *In re J.J.C.*, 294 Ill. App. 3d at 237.

¶ 87    In this case, it is clear that the police frustrated the efforts of defendant's grandparents to see him. While this factor alone does not tip the scales in favor of suppressing defendant's confession, I would find it "contributed significantly to a coercive atmosphere and strongly weighs against a finding that defendant's statement was voluntary." *Griffin*, 327 Ill. App. 3d at 546. Indeed, any other conclusion would negate the legislative intent behind section 5-405.

¶ 88    The majority downplays the significance of the violation of section 5-405, stating that "this is not a situation where a police officer affirmatively refused to let a concerned adult see a juvenile defendant" (*supra* ¶ 54) and therefore, this case does not implicate the concerns raised in decisions such as *Griffin* and *In re J.J.C.* (see *supra* ¶ 54 (finding *Griffin* and *In re J.J.C.* factually distinguishable)). But Robinson's testimony makes it clear that this case is directly on point with *Griffin* and *In re J.J.C.* As the appellate court noted on review from the denial of defendant's postconviction petition, there was "undisputed testimony that [Robinson] had gone to the police station and been refused a request to see defendant." *People v. Murdock*, No. 3-07-0438 (2009) (unpublished order under Supreme Court Rule 23). I am deeply concerned that it is only by ignoring evidence that was properly introduced by defendant at the postconviction hearing that the majority can reach its result.

¶ 89    Other factors also weigh in favor of suppression of defendant's oral statements. As the majority notes, "no juvenile officer was present in the room with defendant" (*supra* ¶ 51), in violation of section 5-405. This was true even though Mushinsky was trained as a juvenile officer. That is, there was literally a juvenile officer immediately at hand in the form of Mushinsky, yet the police did not provide him to defendant. Instead, Mushinsky functioned as an investigator. This failure also weighs very heavily against a finding that defendant's statements were voluntary. See, *e.g.*, *Griffin*, 327 Ill. App. 3d at 547-48.

¶ 90    Defendant's lack of criminal history and experience with the criminal justice system also weighs against a finding of voluntariness. At the postconviction hearing, defendant's trial counsel described defendant as "very unsophisticated" and stated that he "was very, very frightened of the whole proceeding." Counsel explained that defendant "was just a young—young man that was—I don't believe he had a prior criminal record. I know that he was not a gang banger or anything like that, and this was something that he was in way over his head on." This testimony was uncontested and also weighs heavily against the voluntariness of defendant's statements.

¶ 91    Further, the length of defendant's detention weighs against the voluntariness of his oral statements. Defendant arrived at the police station about 3 p.m. and remained continuously in custody from that point on. Mushinsky entered the interview room at approximately 5:30 p.m., offered defendant food and a drink, and then left. Except for that brief moment,

defendant sat alone in the station for almost four hours until Mushinsky began the interrogation at 6:45 p.m.

¶ 92    The majority points to the videotape as evidence of defendant's demeanor, noting that on the videotape, "defendant does not appear to be sweating or shaking" and "appears for the most part calm and alert." *Supra* ¶ 46. This misses the point. The videotape is not the crucial piece of evidence against defendant, as it does not contain the admission that defendant knew what Fleming and Trapp were planning to do.[6] The key evidence is the oral interview with Mushinsky which occurred some three hours before the videotape was recorded. There is, therefore, no physical record of defendant's demeanor during the critical period during which defendant was questioned by Mushinsky without the support or advice of a functioning juvenile officer or a concerned adult.

¶ 93    Given the foregoing circumstances, I would find that defendant's motion to suppress his oral statements is meritorious. Nothing in the evidence introduced at the subsequent suppression hearing undermines that conclusion.

¶ 94    Turning to whether there is a reasonable probability that the outcome of the trial would have been different, I note that the key issue in the State's case against defendant was whether defendant knew what Fleming and Trapps were planning when he drove them to Logan Park. The only time defendant admitted to that knowledge was in the oral interview with Mushinsky. Without those oral statements, there is a reasonable probability that the result of the trial would have differed. Accordingly, I would hold that defendant has established his postconviction claim of ineffective assistance of counsel and the matter should be remanded for a new trial.

¶ 95    Today's decision is troubling not only because the majority rejects defendant's meritorious sixth amendment claim, but because the majority fails to recognize the prejudice the appellate court's erroneous analysis has had on this litigation. In the context of such a claim, it is at the postconviction third-stage evidentiary hearing that facts are to be adduced regarding whether the motion to suppress, had it been filed, would have been successful. The circuit court here found at the conclusion of the May 2007 postconviction evidentiary hearing that such a motion would not have been successful, and the court denied defendant's postconviction petition. On appeal, the appellate court should have reviewed those findings, either affirming the circuit court or reversing and granting defendant postconviction relief in the form of a new trial. What the appellate court should *not* have done was what it ultimately did: tack onto the completed postconviction evidentiary proceedings an unnecessary "suppression hearing." I fear that both bench and bar will read the majority's silence on this particular issue as a tacit endorsement of the appellate court's erroneous approach. This it must not do. The Post-Conviction Hearing Act is structured as it is in order that collateral claims of constitutional error can be adjudicated as promptly as possible and as close in time to the events in question as possible. The need for a prompt adjudication

---

[6]The videotape is in some respects actually helpful to defendant, as defendant states on the videotape that he did not know that Fleming and Trapps intended to shoot Eppinger until he saw them take out their guns in the alley.

stems from the fact that over the passage of time, memories fade and witnesses are no longer available, which makes it all the more difficult to ascertain the truth. The appellate court's error jeopardizes this critical aspect of the statutory postconviction remedy, as this case aptly demonstrates. It cannot be questioned that the evidentiary hearing held in 2007 was closer in time to defendant's 2001 interview with Mushinsky than was the unnecessary 2010 hearing. As a result of the appellate court's error and the majority's refusal to acknowledge it, the evidence adduced in 2007—favorable to defendant and closer in time to the events in question—is today totally ignored in favor of evidence adduced unnecessarily in 2010, some nine years after defendant's interview with Mushinsky. I submit that this is not the proper way to litigate a postconviction claim such as this one, and for that reason I respectfully dissent.

¶ 96        JUSTICES FREEMAN and THEIS join in this dissent.